STATE OF CONNECTICUT *v.* JEFFREY T. CONNOR
(SC 18099)
(SC 18101)

Rogers, C. J., and Katz, Palmer, Vertefeuille and Zarella, Js.

Argued April 21, 2008—officially released July 14, 2009

*Katharine S. Goodbody*, special public defender, for the appellant in Docket No. SC 18099 (defendant).

*Glenn W. Falk*, special public defender, for the appellant in Docket No. SC 18101 (defendant).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Anne Mahoney*, senior assistant state's attorney, for the appellee in Docket Nos. SC 18099 and SC 18101 (state).

*Opinion*

PALMER, J. A jury found the defendant, Jeffrey T. Connor, guilty of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (C), robbery in the third degree in violation of General Statutes § 53a-136, robbery involving an occupied motor vehicle in violation of General Statutes § 53a-136a, and larceny in the third degree in violation of General Statutes (Rev. to 1997) § 53a-124 (a) (1). Following the jury verdict, the trial court, after a hearing, found that the defendant had violated the conditions of probation that previously had been imposed on him in connection with a prior, unrelated conviction.[1] In light of that finding, the court revoked the defendant's probation and sentenced him under General Statutes § 53a-32 to three years of impris-

---

[1] We hereinafter refer to the case in which the jury found the defendant guilty of kidnapping, robbery and larceny (Superior Court Docket No. HHD-CR-02-0185903-T) as the "criminal case" and the case in which the court found that the defendant had violated the conditions of his probation (Superior Court Docket No. HHD-CR-94-0136168-S) as the "probation violation case."

onment. Thereafter, the trial court rendered judgment in accordance with the jury verdict in the criminal case and sentenced the defendant to a total effective prison term of thirteen years, to run consecutively to the three year sentence that had been imposed in the probation violation case.

On appeal,[2] the defendant, who represented himself both at the trial of his criminal case and at the hearing in his probation violation case, claims that the trial court improperly found that he was competent to waive his right to counsel in both of those cases. We agree with the defendant that he is entitled to a new probation violation hearing because the trial court failed to ensure that the defendant had waived his right to counsel knowingly, intelligently and voluntarily in the probation violation case. With respect to the defendant's claim concerning his self-representation in the criminal case, we reject his contention that the trial court violated his constitutional right to counsel by permitting him to represent himself in the trial of that case. We also conclude, however, that, in accordance with the recent decision of the United States Supreme Court in *Indiana* v. *Edwards*, 554 U.S. 164, 128 S. Ct. 2379, 171 L. Ed. 2d 345 (2008), and contrary to prior decisions of this court, a mentally ill or mentally incapacitated defendant who is found competent to stand trial is not necessarily competent to represent himself at trial, and, therefore, the trial judge must determine whether such a defendant is, in fact, competent to represent himself during the trial proceedings. Because the trial court in the

---

[2] The defendant appealed to the Appellate Court from the judgment of the trial court in the probation violation case, and he appealed separately from the trial court's judgment in his criminal case directly to this court pursuant to General Statutes § 51-199 (b) (3). We originally transferred the latter appeal to the Appellate Court, which ordered that the two appeals be consolidated for purposes of argument only. We thereafter transferred both appeals to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

present case was bound by then controlling precedent to permit the defendant to represent himself in view of the fact that he had been found competent to stand trial, we remand the criminal case to the trial court for a determination of whether the defendant was sufficiently capable, despite any mental illness or incapacity, to defend himself without the aid of counsel. If the court finds that the defendant was not competent, due to mental illness or other mental incapacity, to try the case himself, then the defendant must be granted a new trial in the criminal case.

We commence our review of the defendant's claims by setting forth the facts and procedural history relevant to those claims. In 1994, the defendant was convicted of sexual assault in the third degree and sentenced to three years in prison, execution suspended, and three years probation with special conditions, including the requirement that he successfully complete a sex offender treatment program. He also was required to report to his probation officer and to notify her in the event that he was charged with any criminal offense.

While on probation, the defendant abducted his former wife, Marsha Viklinetz, which led to the charges of which he was found guilty in the criminal case. On the basis of the evidence adduced by the state at his trial in the criminal case, the jury reasonably could have found the following facts. On February 24, 1997, Viklinetz was operating her vehicle near her place of employment in East Hartford. While stopped at a stop sign, she observed the defendant on the sidewalk to her right. Viklinetz was surprised to see the defendant because he did not live or work in the area, and she previously had obtained a restraining order against him. When she saw the defendant approaching her car, Viklinetz locked the doors and rolled up the windows. The defendant, however, punched his fist through the driver's side window and forced his way into the vehicle,

pushing Viklinetz into the passenger seat and gaining control of the vehicle. The defendant proceeded onto a highway, where he reached speeds of up to ninety miles per hour. At times, the defendant was irrational, threatening to kill Viklinetz and himself by driving the car off the road. At other times, he was calm and told Viklinetz that he loved her and that they should reconcile. The defendant continued to drive for approximately thirty minutes, at which time the vehicle began to run low on fuel. The defendant stopped at a gas station in Berlin. At that point, Viklinetz got out of the vehicle and attempted to take the keys from the defendant. After a brief struggle, the defendant jumped into the vehicle alone and drove away. Viklinetz ran into the gas station and contacted the police. Her car eventually was recovered in New Britain.

In the spring of 1997, the defendant was charged with violating the conditions of probation that had been imposed in connection with his 1994 conviction for sexual assault in the third degree. Specifically, he was charged with failure to complete his sex offender treatment program, failure to report for scheduled meetings with his probation officer and failure to report to his probation officer the criminal charges stemming from the February 24, 1997 incident. For reasons that are not clear from the record, the defendant was not arrested, either in connection with the criminal case or the probation violation case, until October, 2002.

Following the defendant's arrest, the state proceeded first on the criminal case. The extensive pretrial proceedings in the case reveal repeated attempts by the court to ascertain the defendant's competency both to stand trial—attempts that were complicated by the defendant's refusal to cooperate with court evaluation teams—and to discharge his court-appointed counsel and to represent himself. These proceedings began on October 8, 2003, when the public defender representing

the defendant at the time, M. Fred DeCaprio, expressed concern that the defendant, who recently had suffered a stroke that had rendered him unable to walk,[3] might not be competent to stand trial. At that time, however, the trial court, *Solomon, J.*, took no action with respect to the issue of the defendant's competency.

Thereafter, DeCaprio was replaced as the defendant's counsel by a second public defender, R. Bruce Lorenzen. On June 2, 2004, however, the defendant requested that Judge Solomon discharge Lorenzen because, according to the defendant, Lorenzen had not been representing him adequately. In particular, the defendant claimed to have learned that several detainers had been lodged against him, and he was not satisfied with Lorenzen's explanation that Lorenzen had been unable to confirm the existence of any such detainers. The defendant also explained that he had suffered a stroke, and he further informed the court that "the left side of my brain is not working as it should be . . . ." The assistant state's attorney indicated that, under the circumstances, the court "ha[d] . . . no choice but to order" a competency evaluation. Judge Solomon denied the defendant's request for new counsel, explaining that the defendant had failed to provide any information supporting his request that Lorenzen be discharged. Judge Solomon also ordered a competency evaluation of the defendant pursuant to General Statutes § 54-56d.[4]

[3] The defendant was confined to a wheelchair throughout the pretrial proceedings, the trial in the criminal case and the probation violation hearing.

[4] General Statutes § 54-56d provides in relevant part: "(a) A defendant shall not be tried, convicted or sentenced while the defendant is not competent. For the purposes of this section, a defendant is not competent if the defendant is unable to understand the proceedings against him or her or to assist in his or her own defense.

"(b) A defendant is presumed to be competent. The burden of proving that the defendant is not competent by a preponderance of the evidence and the burden of going forward with the evidence are on the party raising the issue. The burden of going forward with the evidence shall be on the state if the court raises the issue. The court may call its own witnesses and conduct its own inquiry.

The defendant next appeared in court on July 15, 2004. The defendant was represented by Sara Bernstein, a public defender who was standing in for Lorenzen. Bernstein informed Judge Solomon that the evaluation team had been unable to conduct its assessment of the defendant because the defendant had refused to cooperate with the team. Judge Solomon advised the defendant, who also refused to communicate with the court at the hearing, that it would be in his best interest to cooperate with the evaluation team. Judge Solomon then ordered that the team make another attempt to examine the defendant in accordance with § 54-56d.

Judge Solomon held a hearing on August 19, 2004, for the purpose of ascertaining the status of that evaluation. The assistant state's attorney reported that the defendant had persisted in his refusal to cooperate with the examination team. The defendant, however, denied that he had refused to speak to the team members. The defendant did acknowledge that he had stopped eating for a time, but he further indicated that he had started to eat again. Although the assistant state's attorney suggested that the defendant ought to be placed on suicide watch by the department of correction, she also stated that he appeared to be "oriented to time and place," that his conduct reflected a "series of power struggles between [the] defendant and whomever else he's dealing with," including counsel and the court, and that he appeared competent to stand trial. Lorenzen, who represented the defendant at the hearing, stated that

"(c) If, at any time during a criminal proceeding, it appears that the defendant is not competent, counsel for the defendant or for the state, or the court, on its own motion, may request an examination to determine the defendant's competency.

"(d) If the court finds that the request for an examination is justified and that, in accordance with procedures established by the judges of the Superior Court, there is probable cause to believe that the defendant has committed the crime for which the defendant is charged, the court shall order an examination of the defendant as to his or her competency. . . ."

he could not be sure why the defendant was refusing to cooperate, but he expressed the belief that the defendant "would be found competent." Judge Solomon attempted to schedule a pretrial hearing for the purpose of discussing a possible plea bargain, but the defendant repeatedly insisted that he was not interested in pleading guilty and that he wanted to proceed to trial. Although Judge Solomon expressed frustration with the defendant's "refusal to cooperate with [the evaluation] process," he explained that, on the basis of the representations that had been made at the hearing, he was obliged to find the defendant competent to stand trial. Judge Solomon also placed the case on the firm jury list.

The evaluation team nevertheless continued to attempt to examine the defendant, and, on March 11, 2005, the trial court, *McMahon, J.*, held another hearing for the purpose of determining the defendant's competency. At that hearing, Madelyn Baranoski, a clinical psychologist, testified that she and the other members of the evaluation team, including a psychiatrist and a social worker, had met with the defendant on January 20, 2005, for the purpose of conducting a competency evaluation. The team was unable to reach a conclusion with respect to the defendant's competency, however, because he had refused to cooperate with the team and he had refused to grant the team permission to review his medical records. When Baranoski was asked if the team had observed any signs that the defendant suffered from mental health problems, however, she testified as follows: "[B]oth by history and by presentation, [the defendant] gave evidence to us that there is a strong possibility that he has significant mental health problems. Unfortunately, however, his refusal to continue with the evaluation interfered with our ability to assess the functional capacity that's needed to . . . determine whether he can assist [counsel] and understand [the] charges [against him]." Baranoski further explained

that the defendant's referrals to various mental health units in the department of correction suggested that the defendant might suffer from a "significant" mental health problem. According to Baranoski, a neuropsychological evaluation had been performed on the defendant by a clinical psychologist sometime after the defendant's arrest, and that evaluation indicated that the defendant "showed word-finding difficulty, memory difficulty, and some thinking impairment that was secondary to a stroke that [the defendant] had . . . about two years [beforehand], maybe a little more, while he was in Florida. There was also a history from [that] report that [the defendant] has a history of using [illegal] substances." Baranoski further stated that there were indications that the defendant's stroke and resulting paralysis were "secondary to cocaine use." Baranoski opined that this information "gave a basis for a good chance that [the defendant] has significant mental health problems."

With respect to the issue of malingering, Baranoski acknowledged that that was a possibility, but she also explained that the defendant "did not present a clear picture of malingering." Baranoski observed that, although the defendant had conducted himself appropriately in certain respects, he also had eaten feces in the presence of the team, he had indicated that he did not know his name, his birthday or the charges pending against him, and he had refused to authorize the release of his medical records even though it was likely that the release of those records would have been helpful to him. Baranoski explained: "[T]he team was left with bizarre behavior, uncooperative behavior, a history that suggests significant mental illness but a lack of access to information to understand whether his lack of cooperation was wilful, or whether it resulted from some organic process because of the stroke, or because [he is] delusional."

Baranoski further observed that, "[w]e know [the defendant is] brain damaged because he is paralyzed. And we can see the wasting of his limbs, so we know the stroke caused part of his brain to do that. We don't know—was part of the stroke in the frontal lobe of the brain, which would interfere with judgment and cognitive ability." If so, Baranoski indicated that he most likely would not be competent to stand trial. Baranoski also observed, however, that the stroke might have affected only the motor and sensory areas of the defendant's brain, with little or no effect on his judgment and cognition. According to Baranoski, it was unlikely that the defendant would agree to cooperate with any future evaluation. She suggested, therefore, that the best way to determine whether the defendant was malingering would be "extensive observation in a professional setting," that is, a psychiatric institution.

On the basis of Baranoski's testimony, Judge McMahon observed that there are "clear indications of organic, psychological damage," and that the evidence indicated that the defendant was unable to assist and cooperate with counsel. The court therefore found that the defendant was not competent to stand trial and ordered that the defendant be committed to Connecticut Valley Hospital (hospital) for the purpose of restoring him to competency.

Judge McMahon held another competency hearing on May 12, 2005. This hearing was conducted in the defendant's absence because he had refused to be transported from prison to court that day.[5] At the hearing, Tim Schumacher, a clinical psychologist associated with the hospital, testified that he repeatedly had attempted to interview the defendant for purposes of

[5] Judge McMahon found that the defendant had "voluntarily absented himself from [the] proceedings, as an ongoing pattern of behavior on his part." The court, therefore, proceeded with the hearing without the defendant.

a competency evaluation. According to Schumacher, those attempts were "so fraught with lack of cooperation" that he and his examination team, which included a forensic psychiatrist, a social worker and several nurses, had to limit their evaluation of the defendant to a review of his "informal behavior" at the hospital and his answers to a short series of questions pertaining to his knowledge of court operations. With respect to the latter, Schumacher testified that the defendant gave the wrong answer to virtually all of the questions; according to Schumacher, in view of the nature of the questions, the defendant deliberately had provided wrong answers. With respect to the team's informal observations of the defendant while he was confined at the hospital, they observed that the defendant had interacted with others on a daily basis in "an intelligent, reasonable way . . . ." Schumacher further testified that, in his opinion, the defendant's refusal to cooperate with the team was a reflection "of his antisocial personality." The team determined that the defendant's refusal to cooperate was "volitional" and motivated by a desire to "thwart [his] prosecution." Judge McMahon, who noted the defendant's "clear pattern . . . [of] do[ing] almost anything to avoid [trial]," accepted the team's conclusions and found the defendant competent to stand trial.

At a court appearance on June 23, 2005, the defendant requested that Lorenzen be removed as counsel. At that time, the defendant expressed a desire to represent himself because of his dissatisfaction with Lorenzen. He also repeatedly expressed a need to determine whether any warrants were outstanding against him "worldwide," and, despite the state's representation that there appeared to be no such warrants, the defendant continued to focus on them as an impediment to an ultimate resolution of his case. The trial court, *Miano, J.*, canvassed the defendant and concluded that

he was incapable of representing himself because his preoccupation with other issues that were irrelevant to his trial precluded him from focusing on the pending charges. Judge Miano also concluded that there were insufficient grounds to discharge Lorenzen. Finally, after noting that the state had made a plea offer that would have required the defendant to serve twenty years in prison,[6] Judge Miano expressed his belief that a more appropriate sentence, and one that the court would impose, was a prison term of twenty years, suspended after ten years, followed by a period of probation.[7] The defendant requested a short period of time to consider that plea arrangement, and Judge Miano granted the defendant's request. Thereafter, on June 30, 2005, the defendant rejected the proposed plea arrangement.

At a subsequent hearing on October 27, 2005, the defendant renewed his request to discharge Lorenzen and to represent himself. Judge Miano canvassed the defendant about his decision. In particular, Judge Miano informed the defendant that if he had legitimate grounds to have another public defender appointed, the court would do so. Judge Miano also told the defendant that he could retain private counsel if he wished, and that the defendant would be granted a reasonable continuance to obtain such counsel. Under questioning from Judge Miano, the defendant (1) stated that he had received his general equivalency diploma, (2) indicated that he understood that he would be at a distinct disadvantage if he elected to represent himself, (3) listed the various offenses with which he had been charged, and (4) explained the factual allegations underlying those

[6] The state's offer, which also included a resolution of the probation violation charge, was a term of imprisonment of thirty years, execution suspended after twenty years, and five years probation.

[7] The offer tendered by the court also included any prison time that the defendant faced as a result of his alleged violation of probation.

charges. After further emphasizing the pitfalls of self-representation, and on the basis of the defendant's responses to his questioning, Judge Miano granted the defendant's request to represent himself. Lorenzen was appointed to serve as standby counsel pursuant to Practice Book § 44-4.[8]

At the next hearing, on December 15, 2005, the defendant was completely unresponsive to questioning by Judge Miano, who noted that the defendant had his head in his lap and appeared to be asleep. In fact, the defendant did not respond even when jostled by a correction officer upon Judge Miano's request. One of the correction officers informed Judge Miano, however, that the defendant had been responsive to instructions as he was being transported to court that morning and that he generally had been responsive to the officers in the correctional facility where he was being held. The assistant state's attorney asserted that the defendant was malingering, and referred the court to a prior competency report in which the evaluators had reached that same determination in concluding that the defendant was competent to stand trial. Because of the defendant's unresponsive behavior, however, Judge Miano ordered another competency evaluation.

At a brief hearing on January 26, 2006, Judge Miano stated that the evaluation team had requested more time because the defendant had been "less tha[n] cooperative." Apparently, the defendant, who was not present at the hearing, had refused even to see the team

[8] Practice Book § 44-4 provides: "When a defendant has been permitted to proceed without the assistance of counsel, the judicial authority may appoint standby counsel, especially in cases expected to be long or complicated or in which there are multiple defendants. A public defender or special public defender may be appointed as standby counsel only if the defendant is indigent and qualifies for appointment of counsel under General Statutes § 51-296, except that in extraordinary circumstances the judicial authority, in its discretion, may appoint a special public defender for a defendant who is not indigent."

members when they arrived at the correctional facility to interview him. Judge Miano continued the matter until February 23, 2006, at the request of the evaluation team.

Although the defendant was present in court on February 23, 2006, the hearing did not go forward at that time. Humberto Temporini, a consulting forensic psychiatrist with the office of court evaluations and an evaluation team member, also was present. Because Temporini previously had not been able to meet with the defendant, he took the opportunity to attempt to do so at that time. The defendant again was completely unresponsive and remained slumped forward in his wheelchair during his brief court appearance. Judge Miano rescheduled the competency hearing for March 2, 2006.

At the March 2, 2006 hearing, the defendant once again was unresponsive, and, in view of that fact, Judge Miano granted the state's motion to reinstate Lorenzen as counsel. The state then elicited testimony from Temporini, who explained that, although the defendant had not cooperated, Temporini had reviewed a competency evaluation of the defendant that had been prepared one year earlier, as well as a report prepared by the Whiting Forensic Division of the hospital in May, 2005. In addition, Temporini had reviewed other relevant medical records and had spoken to various representatives from the office of the public defender, including Lorenzen. Temporini concluded that the defendant was competent to stand trial and that his unwillingness to cooperate was "apparently wilful behavior," likely motivated by a fear of leaving "the security of a correctional institution." Following Temporini's testimony, Lorenzen argued that the behavior exhibited by the defendant served no rational purpose and carried only negative consequences for the defendant. Lorenzen maintained

that Judge Miano should consider that fact in determining whether the defendant was competent to stand trial.

After reviewing the reports that the state submitted, Judge Miano concluded that the defendant was, in fact, malingering, and that he was competent to stand trial. In reaching his conclusion, Judge Miano relied in part on evidence demonstrating that the defendant generally participated in the regular activities at the hospital where he had been confined and that he generally interacted normally with other patients, hospital staff and correction officers. Judge Miano also noted that the defendant previously had been "very animated in his desire to represent himself," at which time the defendant was, according to Judge Miano, "clear, cogent and ardent." Because the defendant remained unresponsive, or "comatose," as Judge Miano characterized him, Judge Miano reiterated that it was necessary to reverse his earlier decision to grant the defendant's request to represent himself. In particular, Judge Miano stated that, on the basis of the defendant's "demeanor" at the March 2, 2006 hearing, he "[could not] imagine how [he] could allow [the defendant] to represent himself."[9]

The defendant's trial was scheduled to begin on April 3, 2006, with the court, *Espinosa, J.*, presiding. Before the commencement of trial proceedings on that date, however, Judge Miano held a brief hearing for the purpose of having "one [final] opportunity to talk to [the defendant] . . . ." Upon arriving in the courtroom, the

[9] At the March 2, 2006 hearing, Judge Miano also reviewed a letter, dated January 21, 2006, that the defendant apparently had submitted to the court. That letter provided in relevant part: "I am looking for a good lawyer for my [c]ases . . . [b]ecause . . . [Attorney] Lorenzen is not the one [I] want on my side of [the] [l]aw." In the letter, the defendant explained that he did not trust Lorenzen because Lorenzen had not done anything about certain detainers or other warrants that the defendant claimed were outstanding. The letter also provided: "So I need [two] weeks to get myself a [s]pecial [p]ublic [d]efender . . . . [I] need [someone] to help me [Y]our Honor . . . ."

defendant, who was seated in his wheelchair, kept his head down. Judge Miano could not discern whether the defendant's eyes were open or closed, and the defendant was unresponsive to Judge Miano's questioning. After learning from the correction officers accompanying the defendant that the defendant had been alert and cooperative with them earlier that morning, Judge Miano informed the defendant that, in his opinion, the defendant was "malingering or faking it," and that his trial was to begin that day. Judge Miano told the defendant that he was concerned that his conduct would "hurt [him] with the jury." In particular, Judge Miano advised the defendant that it would be a mistake for him to appear before the jury in prison garb rather than civilian clothing. Judge Miano also urged the defendant to cooperate with his attorney. The defendant, however, refused even to acknowledge that Judge Miano was speaking to him. Judge Miano then indicated that Judge Espinosa would be handling the matter from that time forward.

That same day, the defendant appeared before Judge Espinosa, who explained that the case had been assigned to her for trial, and that trial proceedings would commence at that time. Although trial was scheduled to begin, the defendant, who was dressed in prison attire, remained unresponsive. At Judge Espinosa's request, Lorenzen informed the defendant of his right to change into civilian clothing, and, after doing so, Lorenzen reported that he had received no response from the defendant. Judge Espinosa indicated that the trial would proceed with the defendant dressed in his prison clothing.

Immediately after the prospective jurors had been brought into the courtroom, Judge Espinosa excused them, noting that the defendant had raised his head and appeared to be alert. Judge Espinosa also stated that the defendant's conduct reflected his continued

"malingering" and that he had been "putting on an act for this trial." The defendant responded that he had not been acting, and informed Judge Espinosa that he could not move his right arm and that his right leg was "bad" and discolored. The defendant complained that Lorenzen had neglected him and requested that he be permitted to represent himself. Among other things, the defendant explained that he had "been praying to God and reading the Bible every day," and that, although he could not "hold any thoughts" when he first was arrested, "now it seems like someone is helping me and . . . it's got to be God or a spirit or something . . . ." The defendant further explained that he had been "reading and reading and reading and [that he] finally [was] getting all the words where [he] need[ed] them." After the defendant reiterated his desire to represent himself, Judge Espinosa reminded him that he had not been speaking in court or otherwise participating in court proceedings. The defendant responded: "Yes, I know. Because the judge over in the other courtroom was a total jerk . . . . He says that I ain't got no warrants, and I was looking at the computer the other day and it·said I have a warrant, a detainer for fighting in jail, but I . . . was not fighting . . . ." Subsequently, the defendant explained that he had refused to cooperate because he did not want Lorenzen to represent him, and that he had been unable to convince Judge Miano to discharge Lorenzen, whom the defendant did not trust. The defendant also spoke further about his various physical disabilities, all of which appeared to be related to his stroke and that, in the defendant's view, had become exacerbated as a result of the failure of department of correction officials to address those physical problems.

At this point, Lorenzen summarized the history of the case with respect to the issue of the defendant's competency and his desire to represent himself. When

Lorenzen finished speaking, the defendant reiterated his complaints against Lorenzen, claiming, for example, that he had given Lorenzen a list of 120 witnesses but that Lorenzen essentially had ignored the list, selecting only five of the witnesses, all of whom were, according to the defendant, "on the state's side . . . ." The defendant again urged Judge Espinosa to permit him to represent himself. Judge Espinosa advised the defendant that, in her opinion, to do so would result in a "sure conviction . . . ." The defendant responded, "I don't care if it's a sure conviction. I do not want [Lorenzen] as my attorney." Judge Espinosa then canvassed the defendant, asking him first about his educational background. The defendant stated that he had "been to school but . . . [could not] really say where because [he did not] know." When the defendant was questioned by Judge Espinosa about why he did not know where he had gone to school, he responded: "Because the stroke—I had a stroke, and everything I've been learning is from [the] Bible." Although the defendant recalled that he had suffered the stroke more than three and one-half years earlier, he could not remember where he was living at the time. The defendant represented to Judge Espinosa that his stroke had impaired his long-term memory. In particular, the defendant stated that he had no recollection of the February 24, 1997 incident that gave rise to the charges in the criminal case. Judge Espinosa asked the defendant "[h]ow [he could] represent [him]self if [he did not] have any memory . . . ." The defendant responded: "Because I . . . can. I will do . . . the best I can and through the Bible, I swear to—I promise to God."

Judge Espinosa then informed the defendant that, in light of the charges, he faced a long prison term, possibly forty years. Judge Espinosa again warned the defendant that, for many reasons, it would not be wise for him to represent himself. The defendant responded,

however, that he would be able to do so with God's help. Thereafter, Judge Espinosa stated: "All right. Very well. The court finds that having inquired of the defendant for almost [one] hour here—the court finds that [the defendant] is competent to represent himself. He is articulate, he's lucid, he knows what he's doing. He . . . devised a calculated plan to disrupt the trial in front of Judge Miano because he wasn't getting his way with his lawyer . . . ."[10] Judge Espinosa also appointed Lorenzen to serve as standby counsel.[11] Finally, Judge Espinosa advised the defendant that the jury might believe that he was dangerous if he remained clothed in prison garb. The defendant responded, "I'm probably dangerous." Apparently believing that his pretrial incarceration was relevant to his case, the defendant indicated that he had no reason to change out of his prison clothing.

Prior to trial in the criminal case, the state filed a substitute information charging the defendant with kidnapping in the first degree, robbery in the third degree, robbery involving an occupied motor vehicle, larceny in the third degree and stalking in the first degree. The defendant entered a plea of not guilty to all of the charges. The evidentiary portion of the trial was scheduled to commence on April 27, 2006, thereby affording the defendant time to prepare.

The defendant encountered difficulties in representing himself at various stages of the trial proceedings. For example, during voir dire, the defendant asked a prospective juror a long-winded, confusing question

---

[10] The defendant appeared to express his disagreement with Judge Espinosa's observation that he intentionally had been disruptive during prior court proceedings.

[11] The defendant objected to Lorenzen's appointment as standby counsel, explaining that he did not want Lorenzen in the courtroom. Judge Espinosa agreed with Lorenzen's suggestion that he sit in the back of the courtroom, and the defendant acquiesced in that resolution of the matter.

concerning the nature of truth. The defendant also had trouble differentiating between direct and circumstantial evidence and in eliciting relevant testimony from his half brother, Stephen Bigelow, whom he had called as a witness. In fact, outside the presence of the jury, Bigelow told the court that he was very concerned about the mental and physical problems that the defendant suffered as a result of his stroke and that, in light of those problems, the defendant was not competent to represent himself. Moreover, before the jury had been recalled, Bigelow asked the court if he could "say something" to the defendant. Judge Espinosa permitted him to do so, and Bigelow attempted to advise the defendant as to those areas of inquiry about which the defendant properly could question Bigelow. The defendant also repeatedly referred to extraneous matters relating to his health and his treatment in prison, including his allegation that correction officers intended to kill him.

At the conclusion of the trial in the criminal case, the jury found the defendant guilty of the kidnapping, robbery and larceny charges, and found him not guilty of the stalking charge. On May 2, 2006, the day after the jury returned its verdict, the defendant appeared before Judge Espinosa for a hearing in the probation violation case. At the commencement of the hearing, Judge Espinosa asked the defendant if he wished to continue to represent himself. The defendant stated that he did, and Judge Espinosa, without canvassing the defendant further, honored the request and indicated that Lorenzen would continue to serve as standby counsel. Following the probation violation hearing, Judge Espinosa found that the defendant had violated the conditions of his probation, namely, that he had failed to complete court-ordered sex offender treatment, to report to his probation officer, and to notify his probation officer of the pending charges in the criminal case. Judge Espinosa revoked the defendant's proba-

tion and sentenced him to a term of imprisonment of three years.

On July 7, 2006, Judge Espinosa held a sentencing hearing in the criminal case. At the conclusion of the hearing, Judge Espinosa sentenced the defendant to a total effective term of imprisonment of thirteen years, to run consecutively to the three year sentence that previously had been imposed in the probation violation case. On appeal, the defendant claims that he is entitled to a new trial in his criminal case and a new hearing in his probation violation case because Judge Espinosa improperly permitted him to represent himself in the criminal case and the probation violation case. We address the defendant's claim with respect to the criminal case and his claim with respect to the probation violation case in turn.[12]

I

The defendant contends the trial court deprived him of his right to the assistance of counsel guaranteed under the sixth and fourteenth amendments to the

---

[12] Neither of the defendant's claims is preserved, a consequence of the nature of those claims. The defendant seeks to prevail, however, under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). "Under *Golding*, the defendant can prevail on [an unpreserved] claim only if the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *T.R.D.*, 286 Conn. 191, 198–99 n.9, 942 A.2d 1000 (2008). The state concedes that the record is adequate for our review of the claims, both of which are of constitutional magnitude. Accordingly, we consider the merits of the defendant's claims. See *State* v. *Fagan*, 280 Conn. 69, 90, 905 A.2d 1101 (2006) ("[t]he first two *Golding* requirements involve whether the claim is reviewable, and the second two involve whether there was constitutional error requiring a new trial" [internal quotation marks omitted]), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007).

United States constitution,[13] and under article first, § 8, of the Connecticut constitution.[14] In support of his claim, the defendant asserts that the trial court improperly concluded that he was competent to waive his right to counsel at the trial of his criminal case and that he had done so knowingly, voluntarily and intelligently. The defendant further maintains that, once trial had commenced, his conduct during the trial gave rise to a duty on the part of the trial court either to order another competency evaluation or to appoint counsel for him. Finally, the defendant maintains that, even if we conclude that his constitutional right to counsel was not violated, he nevertheless is entitled to a new trial in the interests of justice because his impaired mental condition made it impossible for him to represent himself and to receive a fair trial. We reject the defendant's constitutional claims. We conclude, however, in the exercise of our supervisory authority over the administration of justice, that a defendant, although competent to stand trial, may not be competent to represent himself at that trial due to mental illness or mental incapacity. In accordance with this determination, we also conclude that the case must be remanded to the trial court for a hearing on the issue of whether the defendant's mental illness or incapacity rendered him incompetent to represent himself at the trial in the criminal case.

A

We commence our review of the defendant's claims with a summary of the governing legal principles. A

---

[13] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense."

The sixth amendment right to counsel is made applicable to state prosecutions through the due process clause of the fourteenth amendment. See *Gideon* v. *Wainwright*, 372 U.S. 335, 342, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963).

[14] Article first, § 8, of the Connecticut constitution provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel . . . ."

criminal defendant has a fundamental right to counsel under both the federal and state constitutions. E.g., *State* v. *Gethers,* 193 Conn. 526, 533, 480 A.2d 435 (1984) (state constitution); see *Gideon* v. *Wainwright,* 372 U.S. 335, 339–42, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963) (federal constitution). "Both the federal constitution and our state constitution [also] afford a criminal defendant the right to [forgo] the assistance of counsel and to choose instead to represent himself or herself at trial. As a matter of federal constitutional law, the right to self-representation is premised on the structure of the [s]ixth [a]mendment, as well as in the English and colonial jurisprudence from which the [a]mendment emerged. *Faretta* v. *California,* 422 U.S. 806, 818, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); see also *McKaskle* v. *Wiggins,* 465 U.S. 168, 174, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984); cf. *Gideon* v. *Wainwright,* [supra, 342] ([making sixth amendment right to counsel applicable to states through due process clause of fourteenth amendment]). The Connecticut constitution is more explicit, stating directly that [i]n all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel . . . . Conn. Const., art. I, § 8. We repeatedly have interpreted this language to establish an independent state constitutional guarantee of the right to self-representation. See *State* v. *Townsend,* 211 Conn. 215, 218, 558 A.2d 669 (1989) . . . ."[15] (Citations omitted; internal quotation marks omitted.) *State* v. *Day,* 233 Conn. 813, 820, 661 A.2d 539 (1995). "Although [w]e harbor no illusions that a defendant's decision to waive counsel and [to] proceed pro se generally will lead to anything other than disastrous consequences . . . values informing our constitutional structure teach that although [a defendant] may con-

---

[15] The defendant does not claim, however, that he is entitled to any greater right to self-representation under the state constitution than he is under the federal constitution. For purposes of this appeal, therefore, we treat the two provisions as embodying the same level of protection.

duct his own defense ultimately to his own detriment, his choice must be honored out of that respect for the individual which is the lifeblood of the law. *Illinois* v. *Allen*, [397 U.S. 337, 350–51, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970)] (Brennan, J., concurring)." (Internal quotation marks omitted.) *State* v. *Jones*, 281 Conn. 613, 647, 916 A.2d 17, cert. denied, 552 U.S. 868, 128 S. Ct. 164, 169 L. Ed. 2d 112 (2007); see also *McKaskle* v. *Wiggins*, supra, 176–77 (personal dignity and autonomy of individual provide basis for right of self-representation).

As we previously have observed, "[t]he right to counsel and the right to self-representation present mutually exclusive alternatives. A criminal defendant has a constitutionally protected interest in each, but since the two rights cannot be exercised simultaneously, a defendant must choose between them. When the right to have competent counsel ceases as the result of a sufficient waiver, the right of self-representation begins. . . . Put another way, a defendant properly exercises his right to self-representation by knowingly and intelligently waiving his right to representation by counsel. . . . When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must knowingly and intelligently [forgo] those relinquished benefits. . . . The state bears the burden of demonstrating that the defendant knowingly and intelligently waived his right to counsel. . . .

"[Practice Book § 44-3][16] was adopted in order to implement the right of a defendant in a criminal case

[16] Practice Book § 44-3 provides: "A defendant shall be permitted to waive the right to counsel and shall be permitted to represent himself or herself at any stage of the proceedings, either prior to or following the appointment of counsel. A waiver will be accepted only after the judicial authority makes a thorough inquiry and is satisfied that the defendant:

"(1) Has been clearly advised of the right to the assistance of counsel, including the right to the assignment of counsel when so entitled;

to act as his own attorney . . . . Before a trial court may accept a defendant's waiver of counsel, it must conduct an inquiry in accordance with § [44-3], in order to satisfy itself that the defendant's decision to waive counsel is knowingly and intelligently made. . . . Because the § [44-3] inquiry simultaneously triggers the constitutional right of a defendant to represent himself and enables the waiver of the constitutional right of a defendant to counsel, the provisions of § [44-3] cannot be construed to require anything more than is constitutionally mandated. . . .

"[A] defendant need not . . . have the skill and experience of a lawyer in order competently and intelligently to choose self-representation . . . . Rather, a record that affirmatively shows that [he] was literate, competent, and understanding, and that he was voluntarily exercising his informed free will sufficiently supports a waiver. . . . The nature of the inquiry that must be conducted to substantiate an effective waiver has been explicitly articulated in decisions by various federal courts of appeals. See, e.g., *United States* v. *Cash*, 47 F.3d 1083, 1088 (11th Cir. 1995) (court must inform defendant of charges, included offenses and possible range of punishment); *United States* v. *Hurtado*, 47 F.3d 577, 583 [2d Cir.] (factors determining valid waiver include whether defendant understood that he had choice between proceeding pro se and with assigned counsel, understood advantages of having trained counsel, and had capacity to make intelligent choice) [cert. denied, 516 U.S. 903, 116 S. Ct. 266, 133 L. Ed. 2d 188 (1995)]; *United States* v. *Van Krieken*, 39 F.3d 277, 229

"(2) Possesses the intelligence and capacity to appreciate the consequences of the decision to represent oneself;

"(3) Comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case; and

"(4) Has been made aware of the dangers and disadvantages of self-representation."

(9th Cir. 1994) (defendant must be aware of nature of charges against him, possible penalties and disadvantages of self-representation); *Government of Virgin Islands* v. *James*, 934 F.2d 468, 471 (3d Cir. 1991) (waiver must be made with apprehension of nature of charges, statutory offenses included within them, range of allowable punishments, possible defenses to charges, circumstances in mitigation thereof, and all other facts essential to broad understanding of whole matter); *United States* v. *Silkwood*, 893 F.2d 245, 249 (10th Cir. 1989) (same) [cert. denied, 496 U.S. 908, 110 S. Ct. 2593, 110 L. Ed. 2d 274 (1990)]; *United States* v. *McDowell*, 814 F.2d 245, 251 [6th Cir.] (model inquiry includes questioning about defendant's legal background, knowledge of crimes charged, possible punishments, familiarity with Federal Rules of Evidence and Criminal Procedure, procedure for testifying, and advice that defendant would be better served by representation by trained attorney) [cert. denied, 484 U.S. 980, 108 S. Ct. 478, 98 L. Ed. 2d 781 (1987)]. . . .

"The defendant, however, does not possess a constitutional right to a specifically formulated canvass [with respect to this inquiry]. His constitutional right is not violated as long as the court's canvass, whatever its form, is sufficient to establish that the defendant's waiver was voluntary and knowing. . . . In other words, the court may accept a waiver of the right to counsel without specifically questioning a defendant on each of the factors listed in Practice Book § [44-3] if the record is sufficient to establish that the waiver is voluntary and knowing." (Citations omitted; internal quotation marks omitted.) *State* v. *Diaz*, 274 Conn. 818, 828–31, 878 A.2d 1078 (2005). Furthermore, we will not overturn the trial court's determination with respect to whether the defendant knowingly and voluntarily elected to represent himself in the absence of an abuse of discretion. See, e.g., *State* v. *D'Antonio*, 274 Conn.

658, 709, 877 A.2d 696 (2005); see also *State* v. *Johnson*, 253 Conn. 1, 27 n.26, 751 A.2d 298 (2000) ("[W]e examine the relevant record to determine whether the trial court reasonably could have concluded that the defendant was competent . . . . In doing so, we give deference to the trial court's findings of fact because the trial court has the benefit of firsthand review of the defendant's demeanor and responses during the canvass.").

Moreover, in *Godinez* v. *Moran*, 509 U.S. 389, 113 S. Ct. 2680, 125 L. Ed. 2d 321 (1993), a case involving a purportedly mentally ill defendant who had entered guilty pleas after waiving his right to counsel; see id., 392; the United States Supreme Court held that the competency standard for waiving counsel is no higher than the competency standard for standing trial. Id., 391. Having determined in *Dusky* v. *United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960), that the federal standard for competence to stand trial "is whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him";[17] (internal quotation marks omitted) *Godinez* v. *Moran*, supra, 396, quoting *Dusky* v. *United States*, supra, 402; the court concluded in *Godinez* that a defendant who meets that standard also is competent to waive the right to counsel. *Godinez* v. *Moran*, supra, 399. In other words, "the competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right*, not the competence to represent himself." (Emphasis in original.) Id. Consequently, a defendant's "technical legal knowledge is not relevant to the determination whether he is competent to waive his right to counsel . . . ." (Citations omitted; internal quotation marks omitted.) Id., 400.

---

[17] As we noted previously, this is the standard applicable in this state under § 54-56d. See footnote 4 of this opinion.

As the court in *Godinez* also explained, "[a] finding that a defendant is competent to stand trial, however, is not all that is necessary before he may be permitted to plead guilty or [to] waive his right to counsel. In addition to determining that a defendant who seeks to plead guilty or [to] waive counsel is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary. . . . In this sense there is a 'heightened' standard for pleading guilty and for waiving the right to counsel, but it is not a heightened standard of *competence.*" (Citations omitted; emphasis in original.) Id., 400–401. Of course, "[t]he focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings. . . . The purpose of the 'knowing and voluntary' inquiry, by contrast, is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced." (Citation omitted; emphasis in original.) Id., 401 n.12.

Two years after the United States Supreme Court issued its decision in *Godinez*, this court decided *State v. Day*, supra, 233 Conn. 813, a case in which the defendant, Jason Day, who had been found competent to stand trial, sought to represent himself at trial and was found competent to do so. See id., 818, 825–26. On appeal, Day challenged the trial court's determination that he was competent to try the case himself. See id., 823. We upheld the trial court's finding of competency; id., 826; concluding that, under *Godinez*, "we [were] bound to rule that a defendant who has been found competent to stand trial as a matter of state law also is competent to waive the right to counsel. Application of a stricter competency test in the latter analysis than was used in the former would place an unconstitutional burden on the exercise of the defendant's federal consti-

tutional right to self-representation."[18] Id., 825. Although we observed that "[t]he *Godinez* decision ha[d] been criticized for failing to recognize that competency evaluations necessarily entail a contextual inquiry, the results of which should not be imported automatically from one situation to another"; id.; we concluded that "the question is settled until such time as the United States Supreme Court chooses to revisit it." Id. This court repeatedly has followed the interpretation of *Godinez* that we adopted in *Day*.[19] See, e.g., *State* v. *Ouellette*, 271 Conn. 740, 752–53, 859 A.2d 907 (2004) (waiver of

---

[18] We further explained: "The decision [in *Godinez*] is grounded in two posited equivalencies: (1) that the decision to plead guilty is equivalent to the sum total of decisions a defendant would be required to make at trial; and (2) that the competency required to waive the right to counsel is equivalent to the competency required to waive other constitutional rights incident to a guilty plea. . . . The result of the transitive analysis employed by the court [in *Godinez*] is that any criminal defendant who has been found competent to stand trial, ipso facto, is competent to waive the right to counsel as a matter of federal constitutional law." (Citations omitted.) *State* v. *Day*, supra, 233 Conn. 823–24.

[19] Although *Godinez* involved a defendant who had waived the right to counsel for the purpose of entering a guilty plea; see *Godinez* v. *Moran*, supra, 509 U.S. 392; the defendant in *Day* had waived the right to counsel for the purpose of conducting the trial court proceedings himself. See *State* v. *Day*, supra, 233 Conn. 818. We therefore read *Day* to hold that a defendant who is deemed to be competent to stand trial also is competent to waive the right to counsel not only for the purpose of negotiating or entering a guilty plea but also for the purpose of conducting the trial proceedings himself. Thus, under *Day*, a defendant who is competent to stand trial also is competent to waive the right to counsel for all purposes.

We note that our conclusion in *State* v. *Day*, supra, 233 Conn. 824–25, represented the conclusion of the great majority of courts from other jurisdictions that had considered whether, under *Godinez*, a defendant found competent to stand trial necessarily also was competent to waive the right to counsel at trial. See, e.g., *United States* v. *Ferguson*, 560 F.3d 1060, 1066–67 (9th Cir. 2009) (observing that, prior to *Indiana* v. *Edwards*, supra, 554 U.S. 164, most federal circuit courts of appeals had construed *Godinez* as equating competency to stand trial and competency to waive right to counsel at trial); but see *State* v. *Klessig*, 211 Wis. 2d 194, 212, 564 N.W.2d 716 (1997) ("In Wisconsin, there is a higher standard for determining whether a defendant is competent to represent oneself than for determining whether a defendant is competent to stand trial. This higher standard is not based on the requirements of the [s]ixth [a]mendment . . . but stems from the independent adoption of the higher standard by the [s]tate as allowed under *Godinez*.").

right to jury trial); *State* v. *Johnson,* supra, 253 Conn. 26 (right to plead guilty); *State* v. *Wolff,* 237 Conn. 633, 662–63, 678 A.2d 1369 (1996) (waiver of right to counsel).

After oral argument in the present case, the United States Supreme Court, in *Indiana* v. *Edwards,* supra, 554 U.S. 164, considered a scenario similar but not identical to the fact pattern presented in *Godinez.* In *Edwards,* the respondent, Ahmad Edwards, suffered from a serious mental illness but nevertheless was found competent to stand trial. Id., 168–69. Edwards, however, was minimally competent; as the United States Supreme Court explained, Edwards suffered from a mental condition that fell "in a gray area between *Dusky's* minimal constitutional requirement that measures a defendant's ability to stand trial and a somewhat higher standard that measures mental fitness for another legal purpose [such as to conduct trial proceedings]." Id., 172. Despite his illness, Edwards sought to represent himself at trial. See id., 169. The trial court found that, although Edwards was competent to stand trial, he was not competent to conduct the trial proceedings without counsel. See id. The trial court therefore denied Edwards' self-representation request, and he was represented by counsel, following which he was convicted of attempted murder and battery, among other charges.[20] Id.

_____

[20] We note that Edwards initially was tried on criminal recklessness, theft, attempted murder and battery charges and that the jury found him guilty of criminal recklessness and theft but did not reach a verdict on the remaining charges. *Indiana* v. *Edwards,* supra, 554 U.S. 168–69. Edwards' request to represent himself at this initial trial was denied, and he therefore was represented by counsel. Id. The state of Indiana proceeded to retry Edwards on the attempted murder and battery charges. Id., 169. The trial court again denied Edwards' request to represent himself, and he was represented by counsel at the second trial as well. Id. The jury in the second trial found him guilty of the remaining charges. Id.

Edwards appealed, claiming that he had been denied his constitutional right to represent himself. Id. On appeal, the Indiana Court of Appeals agreed and reversed Edwards' convictions of attempted murder and battery. *Edwards* v. *State*, 854 N.E.2d 42, 45, 52 (Ind. App. 2006). The state of Indiana appealed to the Indiana Supreme Court, which upheld the decision of the Indiana Court of Appeals, concluding that, under *Godinez*, a defendant who is competent to stand trial also is competent to waive counsel and to represent himself at trial and, therefore, that the trial court had denied Edwards his right to represent himself inasmuch as he had been deemed competent to stand trial. *Edwards* v. *State*, 866 N.E.2d 252, 260 (Ind. 2007).

The state of Indiana filed a petition for a writ of certiorari, which was granted; see *Indiana* v. *Edwards*, 552 U.S. 1074, 128 S. Ct. 741, 169 L. Ed. 2d 579 (2007); claiming that, because the trial court reasonably had concluded that Edwards, although minimally competent to stand trial, was not competent to represent himself, the sixth and fourteenth amendments did not bar the trial court from appointing counsel for Edwards despite his desire to represent himself. See *Indiana* v. *Edwards*, supra, 554 U.S. 169. The United States Supreme Court explained that "*Godinez* [did] not answer the question before [the court]"; id., 173; both because *Godinez* involved a defendant who did not seek to represent himself at trial but, rather, who sought only to enter a guilty plea without counsel, and because the trial court in *Godinez* had sought to "*permit* a gray-area defendant to represent himself," and not, as the trial court in *Edwards*, to deny that right to such a defendant. (Emphasis in original.) Id. The court then turned to the "open" question of the proper standard for determining a mentally ill defendant's competence to conduct trial proceedings; 173–74; and expressly concluded that the sixth and fourteenth amendments do, in fact, permit a state to deny the right of self-represen-

tation to a defendant who, though minimally competent to stand trial, "lacks the mental capacity to conduct his trial defense unless represented." Id., 174.

In recognizing this "mental-illness-related limitation on the scope of the self-representation right"; id., 171; the court explained that "[m]ental illness . . . is not a unitary concept" and "interferes with an individual's functioning at different times in different ways. . . . In certain instances an individual may well be able to satisfy *Dusky*'s mental competence standard, for he will be able to work with counsel at trial, yet at the same time he may be unable to carry out the basic tasks needed to present his own defense without the help of counsel."[21] Id., 175–76. Although acknowledging that individual autonomy and dignity underlie the right to self-representation; id., 170–71, 176; the court also reasoned that "a right of self-representation at trial will not affirm the dignity of a defendant who lacks the mental capacity to conduct his defense without the assistance of counsel. . . . To the contrary, given [the] defendant's uncertain mental state, the spectacle that could well result from his self-representation at trial is at least as likely to prove humiliating as ennobling. Moreover, insofar as a defendant's lack of capacity

---

[21] The court in *Edwards* also observed that its prior "mental competency cases set forth a standard that focuses directly [on] a defendant's present ability to consult with his lawyer . . . a capacity . . . to consult with counsel, and an ability to assist [counsel] in preparing [a] defense . . . . See [*Drope* v. *Missouri*, 420 U.S. 162, 171, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975)] (It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, *to consult with counsel*, and to assist in preparing his defense may not be subjected to a trial . . .). These standards assume representation by counsel and emphasize the importance of counsel. They thus suggest (though do not hold) that an instance in which a defendant who would choose to forgo counsel at trial presents a very different set of circumstances, which in our view, calls for a different standard." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Indiana* v. *Edwards*, supra, 554 U.S. 174–75.

threatens an improper conviction or sentence, self-representation in that exceptional context undercuts the most basic of the [c]onstitution's criminal law objectives, [that is] providing a fair trial." (Citation omitted; internal quotation marks omitted.) Id., 176–77. Finally, the court observed that "[trial] proceedings must not only be fair, they must appear fair to all who observe them"; (internal quotation marks omitted) id., 177; and that the appearance of fairness is not likely to be achieved when a defendant, unaided by counsel, is unable to defend himself with even the most minimal degree of skill or competence due to his mental illness or incapacity. See 176–78.

In light of *Edwards*, it is clear, contrary to our holding in *Day*, that we are free to adopt for mentally ill or mentally incapacitated defendants who wish to represent themselves at trial a competency standard that differs from the standard for determining whether such a defendant is competent to stand trial. It is equally clear, however, that *Edwards* does not *mandate* the application of such a dual standard of competency for mentally ill defendants. In other words, *Edwards* did not alter the principle that the federal constitution is not violated when a trial court permits a mentally ill defendant to represent himself at trial, even if he lacks the mental capacity to conduct the trial proceedings himself, if he is competent to stand trial and his waiver of counsel is voluntary, knowing and intelligent.[22] See, e.g., *United States* v. *Ferguson*, 560 F.3d 1060, 1070 n.6

---

[22] *Edwards*, therefore, did not overrule *Godinez*. Rather, *Edwards* clarified that *Godinez* had not adopted a constitutional rule barring states from recognizing that a defendant, although minimally competent to stand trial, is not necessarily competent to represent himself at trial. We note that the permissive nature of *Edwards* apparently creates an anomalous situation in which state courts can determine the level of competency necessary for the exercise of federal constitutional rights such that an individual's right to self-representation under the federal constitution may vary from state to state.

(9th Cir. 2009) (*"Edwards* does not *compel* a trial court to deny a defendant the exercise of his or her right to self-representation; it simply *permits* a trial court to require representation for a defendant who lacks mental competency to conduct trial proceedings" [emphasis in original]); *United States* v. *DeShazer*, 554 F.3d 1281, 1289 (10th Cir. 2009) ("[T]he [United States Supreme] Court reiterated that . . . it is constitutional for a state to allow a defendant to conduct trial proceedings on his own behalf when he has been found competent to stand trial. . . . On the other hand, the state may insist on counsel and deny the right of self-representation for defendants who are competent enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." [Citation omitted; internal quotation marks omitted.]); *State* v. *McNeil*, 405 N.J. Super. 39, 52, 963 A.2d 358 (App. Div. 2009) (*"Edwards* does not prevent a [s]tate from permitting a defendant with a mental illness from representing himself if competent to stand trial; rather, it held that the [s]ixth and [f]ourteenth [a]mendments do not require it").

For the reasons set forth more fully in part I C of this opinion, however, and in accordance with the reasoning of *Edwards*, we do not believe that a mentally ill or mentally incapacitated defendant who is competent to stand trial *necessarily* also is competent to represent himself at that trial. Accordingly, in the exercise of our supervisory authority over the administration of justice,[23] we conclude that, upon a finding that a men-

---

[23] "Appellate courts possess an inherent supervisory authority over the administration of justice. . . . The standards that [are] set under this supervisory authority are not satisfied by observance of those minimal historic safeguards for securing trial by reason which are summarized as due process of law . . . . Rather, the standards are flexible and are to be determined in the interests of justice. . . . [O]ur supervisory authority [however] is not a form of free-floating justice, untethered to legal principle. . . . [T]he integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers. . . . [O]ur supervisory powers

tally ill or mentally incapacitated defendant is competent to stand trial and to waive his right to counsel at that trial, the trial court must make another determination, that is, whether the defendant also is competent to conduct the trial proceedings without counsel. As we discuss more fully hereinafter, we also conclude that the defendant's criminal case must be remanded to the trial court for a determination as to whether the defendant was competent to represent himself at trial. Before addressing that issue in greater detail, however, we first consider whether the trial court violated the defendant's constitutional right to counsel by permitting him to represent himself, because, if so, the defendant is entitled to a new trial irrespective of any relief to which he ultimately may be entitled under the standard that we adopt today, in accordance with *Edwards*, pursuant to our supervisory authority.

B

As we have explained, the defendant raises three arguments in support of his claim of a constitutional violation: (1) the trial court improperly found that he was competent to waive his right to counsel; (2) the trial court improperly found that he voluntarily, knowingly and intelligently waived that right; and (3) even if he cannot prevail on his first two claims, the trial court should have ordered a competency evaluation, or appointed counsel for the defendant, once trial had commenced. We reject each of these claims.

1

With respect to the defendant's first contention, we conclude that the trial court reasonably found that the defendant was competent to stand trial and, therefore,

are invoked only in the rare circumstance where [the] traditional protections are inadequate to ensure the fair and just administration of the courts . . . ." (Internal quotation marks omitted.) *State* v. *Mukhtaar*, 253 Conn. 280, 290 n.11, 750 A.2d 1059 (2000).

that he also was competent, for constitutional purposes, to waive his right to counsel. It is true, of course, that the defendant had suffered a stroke sometime after the incident involving Viklinetz, and that, at one point, Judge McMahon concluded that the defendant, who had refused to cooperate with the evaluation team, was not competent to stand trial because he appeared to be unable to assist counsel. At a subsequent competency hearing, however, a second evaluation team determined that the defendant's continued refusal to cooperate with the team was wilful and concluded, largely on the basis of his relatively normal interactions with other patients and staff at the hospital, that the defendant was competent to stand trial. On the basis of the team's conclusions, Judge McMahon found that the defendant was malingering and that he was competent to stand trial. Following a subsequent hearing at which the defendant was responsive and cooperative, Judge Miano granted the defendant's request to discharge Lorenzen and to proceed pro se. Thereafter, because the defendant had been completely unresponsive during a court proceeding, Judge Miano ordered another competency evaluation. Although the defendant continued to refuse to cooperate with the evaluation team, Judge Miano again found that the defendant was malingering and that he was competent to stand trial. Although Judge Miano revisited and reversed his earlier decision to permit the defendant to represent himself because of the defendant's unresponsiveness in court, Judge Espinosa thereafter granted the defendant's renewed request to represent himself in light of the defendant's willingness and ability to interact with Judge Espinosa. Because the record reasonably supports the trial court's conclusion that the defendant was competent to stand trial, we will not disturb that finding.

The defendant refers to a number of instances of his behavior that, he contends, demonstrates that he was

not competent to stand trial, including his purported inability to remember the incident that led to his arrest, his numerous references to God and the Bible, his difficulty in focusing on issues relevant to his trial and his refusal to change out of his prison clothes. We are not persuaded that these facts undermine the trial court's finding that the defendant understood the proceedings against him and was able to assist in his defense as § 54-56d requires. Although the defendant's conduct was often bizarre, unproductive and even self-defeating, the record also contains evidence of the defendant's lucidity, his ability to understand the proceedings and an awareness of the issues presented by his case. We therefore cannot say that the trial court lacked an adequate basis for concluding that the defendant satisfied the relatively low threshold by which a defendant's competency to stand trial is measured. Our conclusion is buttressed, moreover, by the fact that the trial court reasonably found that the defendant had engaged in a pattern of malingering, which apparently was designed to subvert the state's efforts to bring the defendant's case to trial.

We conclude, therefore, that the defendant was competent to stand trial. He therefore also was competent, for constitutional purposes, to waive his right to counsel. See *Godinez* v. *Moran*, supra, 509 U.S. 399.

2

We also conclude that Judge Espinosa reasonably found that the defendant voluntarily, knowingly and intelligently had waived his right to counsel in the criminal case. The defendant was well aware of his right to be represented by an attorney, and, in fact, he was represented by a public defender for most of the pretrial proceedings.[24] Judge Espinosa repeatedly warned the

[24] The defendant contends that the January 21, 2006 letter that he had submitted to the court requesting counsel other than Lorenzen; see footnote 9 of this opinion; reflects his desire not to waive counsel but to proceed with *different* counsel. Although the defendant appears to have requested

defendant that he did not have the legal training necessary to try the case, that it would be extremely unwise for him to represent himself, that he would be required to follow the rules that govern the conduct of trials, and that he would be given no preferential or special treatment because he was representing himself. Judge Espinosa also explained the range of permissible punishments that could be imposed on the defendant in the event that he was convicted of one or more of the charged offenses. Furthermore, the facts that Judge Espinosa elicited from the defendant during her lengthy colloquy with him support the conclusion that the defendant appreciated the consequences of his decision to represent himself. Furthermore, Judge Miano previously had addressed the factors set forth in Practice Book § 44-3 when he originally granted the defendant's request to represent himself. The defendant therefore cannot prevail on his claim that the record is inadequate to support Judge Espinosa's determination that the defendant's waiver of his right to counsel was voluntary, knowing and intelligent.

3

The defendant also claims that the trial court improperly failed to order another competency hearing or, in the alternative, to appoint counsel to represent the defendant after the trial began. He contends that his conduct during the trial should have alerted the court of the need for such action. We also disagree with this contention.[25]

Because "the conviction of an accused person while he is legally incompetent violates due process"; *Pate* v. *Robinson*, 383 U.S. 375, 378, 86 S. Ct. 836, 15 L. Ed. 2d

---

substitute counsel in January, 2006, it was perfectly clear by April, 2006, that the defendant wanted to proceed to trial without the assistance of counsel.

[25] Although this claim is unpreserved, the defendant is entitled to review of the claim under *Golding*. See footnote 12 of this opinion.

815 (1966); a trial court must be vigilant to the possibility that a competency evaluation may be required in the case of a defendant who, having been found competent prior to the commencement of trial, engages in conduct during the trial that calls his competency into question. E.g., *Drope* v. *Missouri*, 420 U.S. 162, 181, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975) ("[e]ven when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial"); accord *State* v. *Johnson*, supra, 253 Conn. 21. "Section 54-56d establishes the procedural requirements for competency determinations. A court may undertake a competency examination upon a motion by the defendant or the state and in some circumstances must evaluate the defendant's competency sua sponte." *State* v. *Johnson*, supra, 22. Specifically, a "trial court must order a competency hearing at any time that facts arise to raise a reasonable doubt about the defendant's competency to continue with the trial." *State* v. *DesLaurier*, 230 Conn. 572, 589 n.12, 646 A.2d 108 (1994). "[A]s a matter of due process, the trial court is required to conduct an independent inquiry into the defendant's competence whenever [the court becomes aware of] substantial evidence of mental impairment. . . . Substantial evidence is a term of art. Evidence encompasses all information properly before the court . . . . Evidence is substantial if it raises a reasonable doubt about the defendant's competency . . . . The trial court should carefully weigh the need for a hearing in each case, but this is not to say that a hearing should be available on demand. The decision whether to grant a hearing requires the exercise of sound judicial discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Johnson*, supra, 21–22. "[T]he trial judge is in a particularly advantageous position to observe a defendant's conduct

during a trial and has a unique opportunity to assess a defendant's competency. A trial court's opinion, therefore, of the competency of a defendant is highly significant." *State* v. *Garcia,* 81 Conn. App. 294, 303, 838 A.2d 1064 (2004).

In the present case, the defendant cites several instances during the trial proceedings that he claims should have prompted the court to order another competency hearing: (1) during voir dire, the defendant asked a prospective juror a lengthy, confusing question about the nature of truth; (2) the defendant did not know the difference between direct and circumstantial evidence; (3) the defendant attempted to call his sister-in-law to testify regarding his stroke, an irrelevant fact that, in any event, was not in dispute; (4) the defendant engaged in a "rambling dialogue" with the court concerning his health and the fact that he thought that correction officers planned to kill him; and (5) the defendant was unable to pose relevant questions to his half brother, a defense witness. As the state notes, however, this conduct reflects more on the defendant's lack of legal experience and expertise than it does on his mental condition. Moreover, to the extent that these examples of the defendant's conduct might be viewed as suggestive of a diminished mental capacity, they must be considered in the light of other evidence indicating that the defendant was, in fact, competent, including evidence of his ability to follow court rules and procedures and the trial court's directives. We also recognize that the standard governing the determination of competency to stand trial is a relatively low one and that mental illness or reduced mental capacity does not alone provide a basis for concluding that a defendant is not competent to stand trial. Although our review of the trial record reveals that the defendant was sorely lacking in the legal and communication skills necessary to present an effective defense, in that regard,

the defendant is not unlike the vast majority of persons who elect to assert their constitutional right of self-representation. In sum, we cannot say, on the basis of the defendant's conduct during the trial proceedings, that the court was required to order yet another competency evaluation or to appoint counsel to represent him.

## C

We now turn to the issue of whether the defendant is entitled to a new trial because he lacked the ability, due to mental illness or incapacity, to perform the basic functions necessary for the trial of his case. We conclude that the case must be remanded to the trial court, *Espinosa, J.*, for a resolution of this issue.

As we previously have explained, the United States Supreme Court recognized in *Edwards* that a defendant may be competent to stand trial if represented by counsel yet lack the "ability to play the significantly expanded role required for self-representation . . . ." (Internal quotation marks omitted.) *Indiana* v. *Edwards*, supra, 554 U.S. 176. The court therefore concluded that "the [c]onstitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so. That is to say, the [c]onstitution permits [s]tates to insist [on] representation by counsel for *those competent enough to stand trial under Dusky but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves*." Id., 177–78.

We agree with *Edwards* that, in light of "the different capacities needed to proceed to trial without counsel, there is little reason to believe that [the] *Dusky* [competency standard] alone is sufficient" for determining whether a mentally ill or incapacitated defendant who, although competent to stand trial with the aid and assis-

tance of counsel, also is competent to represent himself at that trial. Id., 177. As the court explained, "[d]isorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety, and other common symptoms of severe mental illnesses can impair the defendant's ability to play the significantly expanded role required for self-representation even if he can play the lesser role of represented defendant."[26] (Internal quotation marks omitted.) Id., 176; see also *Massey* v. *Moore*, 348 U.S. 105, 108, 75 S. Ct. 145, 99 L. Ed. 135 (1954) ("[o]ne might not be insane in the sense of being incapable of standing trial and yet lack the capacity to stand trial without benefit of counsel"); *Pickens* v. *State*, 96 Wis. 2d 549, 567, 292 N.W.2d 601 (1980) ("The standard for determining competency to stand trial is whether one is able to understand the proceedings against him and to assist in his own defense. . . . This test assumes [that] the defendant will have representation and that he will be required only to assist in his defense. Certainly more is required [when] the defendant is to actually conduct his own defense and not merely assist in it." [Citation omitted.]), overruled in part on other grounds by *State* v. *Klessig*, 211 Wis. 2d 194, 564 N.W.2d 716 (1997). Simply put,

---

[26] The American Psychiatric Association and the American Academy of Psychiatry and the Law aptly characterized the expanded role of a defendant who represents himself at trial in their amici curiae brief that they filed in *Edwards*: "A pro se defendant must make many more decisions—including the many decisions generally committed to counsel in a normal case. Common decisions . . . include what motions to make before or at trial (for suppression of evidence or otherwise); what questions to ask in voir dire; what to say in opening; whether to object to prosecution questions or statements; what questions to ask in cross-examining the prosecution's witnesses; what witnesses to call and what questions to ask of them; what to say in closing. And many of these decisions must be made quickly, without much if any advance warning or chance to prepare, in a public courtroom, under the pressure of knowing that the consequences may be irreversible and the prosecution ready to exploit errors." Brief of Amici Curiae American Psychiatric Association et al., pp. 22–23, *Indiana* v. *Evans*, supra, 554 U.S. 164.

"[i]t is one thing for a defendant to have sufficient mentation to be able to follow the trial proceedings with the aid of a lawyer, and another to be able to represent himself . . . ." *Brooks* v. *McCaughtry*, 380 F.3d 1009, 1011 (7th Cir. 2004), cert. denied sub nom. *Brooks* v. *Kingston*, 543 U.S. 1054, 125 S. Ct. 912, 160 L. Ed. 2d 778 (2005). Moreover, when a mentally ill or incapacitated defendant is permitted to represent himself at trial despite his or her lack of competence to do so, the reliability of the adversarial process, and thus the fairness of the trial itself, inevitably is cast in doubt. Although we acknowledge that the right of self-representation exists primarily "to affirm the dignity and autonomy of the accused";[27] (internal quotation marks omitted) *State* v. *Brown*, 256 Conn. 291, 302, 772 A.2d 1107, cert. denied, 534 U.S. 1068, 122 S. Ct. 670, 151 L. Ed. 2d 584 (2001); we believe that that interest is outweighed by the interest of the state, the defendant and the public in a fair trial when, due to mental illness, the defendant is incompetent to conduct trial proceedings without the assistance of counsel. We therefore conclude that, when a trial court is presented with a mentally ill or mentally incapacitated defendant who, having been found competent to stand trial, elects to represent himself, the trial court also must ascertain whether the defendant is, in fact, competent to conduct

---

[27] As one court has explained, "we recognize the defendant's right to defend pro se not primarily out of the belief that he thereby stands a better chance of winning his case, but rather out of deference to the axiomatic notion that each person is ultimately responsible for choosing his own fate, including his position before the law. A defendant has the moral right to stand alone in his hour of trial and to embrace the consequences of that course of action. . . . [E]ven a defendant doomed to lose has the right to the knowledge that it was the claim that he put forward that was considered and rejected, and to the knowledge that in our free society, devoted to the ideal of individual worth, he was not deprived of his free will to make his own choice, in his hour of trial, to handle his own case." (Citation omitted; internal quotation marks omitted.) *Chapman* v. *United States*, 553 F.2d 886, 891–92 (5th Cir. 1977).

the trial proceedings without the assistance of counsel.[28]

Because *Edwards* had not been decided prior to the conclusion of the trial in the present case, Judge Espinosa had no alternative, in light of our holding in *State* v. *Day*, supra, 233 Conn. 825, but to permit the defendant to represent himself once it was determined that he was competent to stand trial.[29] We therefore do not know whether Judge Espinosa would have granted the defendant's request to represent himself if she had had the authority to deny the request in accordance with *Edwards* and our holding in the present case. Consequently, the case must be remanded for a determination by the court, *Espinosa, J.*, as to whether the defendant then was competent, notwithstanding any mental disability, to conduct the trial proceedings by himself.[30] In making this determination, the trial court,

---

[28] Because our conclusion is not constitutionally mandated, we adopt this rule in the exercise of our supervisory authority over the administration of justice. See footnote 23 of this opinion.

[29] We hereby overrule that portion of *State* v. *Day*, supra, 233 Conn. 824–25, in which we concluded that a defendant who is competent to stand trial *necessarily* is competent, as well, to waive counsel *and* to represent himself at trial. We do so because we incorrectly concluded in *Day* that, under *Godinez*, we were constitutionally precluded from adopting a higher standard for measuring a defendant's competence to waive the right to counsel than for measuring the defendant's competence to stand trial. See id., 825.

[30] Other courts have adopted this approach when, as in the present case, the trial of a mentally ill defendant had been completed before *Edwards* was decided. See, e.g., *United States* v. *Ferguson*, supra, 560 F.3d 1069, 1070 (remanding case to trial court for determination of whether that court "would have operated differently with the benefit of *Edwards*"); *State* v. *Lane*, 362 N.C. 667, 668, 669 S.E.2d 321 (2008) (case remanded to trial court for hearing to determine whether "the court in its discretion would have precluded self-representation for [the] defendant and appointed counsel for him pursuant to . . . *Edwards*"); see also *United States* v. *Arenburg*, United States District Court, Docket No. 08-CR-090A, 2008 U.S. Dist. LEXIS 60318, *1–2, *10–11, *15 (W.D.N.Y. August 7, 2008) (upon motion of standby counsel, trial court reconsidered decision, made prior to issuance of *Edwards*, to permit defendant, who suffered from mental illness, to represent himself at trial, and court concluded that *Edwards* did not warrant finding that defendant had been incompetent to proceed pro se); cf. *State* v. *Klessig*,

which, as the court emphasized in *Edwards*, is "best able to make [such a] fine-tuned mental capacity [decision], tailored to the individualized circumstances of a particular defendant"; *Indiana* v. *Edwards*, supra, 554 U.S. 177; should consider any and all relevant information, including, but not limited to, the extent to which the defendant's competence to represent himself may have been affected by mental illness, by the stroke that he had suffered, and by any memory problems that he may have experienced as a result of that stroke. The court also should evaluate the extent to which the defendant may have been feigning mental problems. Because of the defendant's refusal to cooperate with the various evaluation teams that had been assembled to assess his competency, it is difficult to discern whether the defendant suffered from a mental illness that, alone or in combination with his stroke, may have rendered him incompetent to represent himself. Accordingly, the trial court may seek to have the defendant examined again if it appears that such an examination would be helpful in resolving the issue presented on remand.[31]

We emphasize that the issue to be decided on remand is not whether the defendant lacked the technical legal

supra, 211 Wis. 2d 212, 214 (in pre-*Edwards* case, determining that *Godinez* allowed court to adopt higher standard for measuring competency to proceed pro se than standard for measuring competency to stand trial and remanding case to trial court for determination of whether defendant, although competent to stand trial, also was competent to represent himself at trial).

[31] Of course, the issue that the trial court must address on remand concerns the defendant's competency to represent himself at the time that the trial took place. Thus, the trial court may elect to order an evaluation of the defendant if it determines that such an evaluation may be useful in ascertaining the defendant's ability to proceed without counsel at that time. Furthermore, if the defendant were to persist in refusing to cooperate with any such evaluation, the trial court would have no choice but to make a determination concerning the defendant's competency to represent himself at the trial that is limited generally to its recollection of the proceedings and its review of the trial transcript and arguments of counsel.

skill or knowledge to conduct the trial proceedings effectively without counsel. Indeed, it appears quite clear that he did lack such skill or knowledge. That fact, however, has no bearing on whether he was competent to represent himself for purposes of *Edwards*. Rather, the determination of his competence or lack thereof must be predicated solely on his ability to "carry out the basic tasks needed to present his own defense without the help of counsel"; id., 175–76; notwithstanding any mental incapacity or impairment serious enough to call that ability into question. Of course, in making this determination, the trial court should consider the manner in which the defendant conducted the trial proceedings and whether he grasped the issues pertinent to those proceedings, along with his ability to communicate coherently with the court and the jury.[32]

## II

The defendant also contends that he was deprived of his right to counsel at his probation violation hearing because the trial court, *Espinosa, J.*, failed to determine at that hearing that he had voluntarily, knowingly and

---

[32] We note that the court in *Edwards* declined to adopt the standard, proposed by the state of Indiana, pursuant to which a mentally ill defendant's competency to represent himself at trial would be determined on the basis of the defendant's ability to "communicate coherently with the court or a jury." (Internal quotation marks omitted.) *Indiana* v. *Edwards*, supra, 554 U.S. 178. The court in *Edwards* explained that it was "sufficiently uncertain . . . as to how that particular standard would work in practice . . . [and therefore] refrain[ed] from endorsing it as a federal constitutional standard . . . ." Id. Although a defendant's ability to communicate coherently is a highly relevant consideration, we do not believe that it is prudent, at least at this time, to attempt to articulate a precise standard for determining whether a mentally ill or incapacitated defendant who has been found competent to stand trial also is competent to represent himself at trial. For present purposes, it suffices to say that the trial court should consider all pertinent factors in determining whether the defendant has sufficient mental capacity to discharge the essential functions necessary to conduct his own defense, including the defendant's ability to relate to the court or the jury in a coherent manner.

intelligently waived his right to representation by counsel. We agree with this claim.[33]

As we previously have explained, the defendant was charged in 2002 with violating the conditions of probation that had been imposed in connection with his 1994 conviction for sexual assault in the third degree, an offense for which the defendant received a three year suspended sentence and a term of probation. The day after the jury returned its verdict in the defendant's criminal case, Judge Espinosa held a hearing to determine whether the defendant had violated the conditions of his probation and, if so, what sanction, if any, would be appropriate. At the commencement of the hearing, Judge Espinosa stated: "We are here on a violation of probation hearing. And, Mr. Connor, do you still want to represent yourself?" The defendant answered in the affirmative, and the court appointed Lorenzen to serve as standby counsel.

The state then adduced testimony from Sharon Ofori, a probation officer who, in 1996, had been assigned to supervise the defendant. According to Ofori, the defendant had failed to abide by certain conditions of his probation. In particular, the defendant failed to complete his required sex offender treatment program, to report to Ofori as required, and to report the then pending criminal charges arising out of the February 24, 1997 abduction of his former wife. At the conclusion of the hearing, at which the defendant testified, Judge Espinosa found that the defendant had violated the

---

[33] In addition, the defendant contends that he is entitled to a new probation violation hearing because he was not competent to waive his right to counsel at that hearing and because the trial court improperly failed to order a competency hearing or to appoint counsel to represent the defendant at the probation violation hearing in light of the defendant's conduct at the trial of his criminal case. We need not reach these claims in view of our conclusion that the record does not establish that the defendant waived his right to counsel voluntarily, knowingly and intelligently and, therefore, that he is entitled to a new probation violation hearing.

conditions of his probation, revoked the defendant's probation, and sentenced him to a term of imprisonment of three years.

In *State* v. *T.R.D.*, 286 Conn. 191, 206, 942 A.2d 1000 (2008), we recently reiterated that a waiver of the right to counsel does not satisfy constitutional requirements unless the record reflects that the defendant was aware of the range of possible punishments. We stated in *T.R.D.*: "[T]here [was] simply no evidence present in the record from which we could infer that the defendant had any meaningful appreciation of the period of incarceration he faced if convicted of the charges he faced. In such circumstances, it [could not] be said that the defendant received a realistic picture from [the court] regarding the magnitude of his decision [to proceed to trial without counsel]. . . . In other words, the record [did] not establish that the defendant knew what he [was] doing and [that] his choice [was] made with eyes open, as the constitution requires." (Citation omitted; internal quotation marks omitted.) Id.; accord *State* v. *Diaz*, supra, 274 Conn. 833–34. Our conclusion in *T.R.D.* is equally applicable in the present case.

Although we acknowledge that a court may be entitled to more leeway with respect to the necessary canvass when, as in the present case, the court just has completed a separate trial involving the same self-represented defendant, minimum constitutional requirements must be satisfied before a defendant will be deemed to have waived his right to counsel. The record, however, contains no indication that the defendant was aware of the fact that he faced a possible prison term of up to three years if the court found that he had violated one or more conditions of his probation. In the absence of such a record, the defendant's waiver is constitutionally inadequate. "The right to counsel is so basic that its violation mandates reversal even if no particular prejudice is shown and even if there is

overwhelming evidence of guilt." (Internal quotation marks omitted.) *State* v. *T.R.D.*, supra, 286 Conn. 206. Consequently, the defendant is entitled to a new probation violation hearing.

The criminal case is remanded to the trial court with direction to determine whether it would have denied the defendant's request to represent himself at trial, due to the defendant's mental illness or mental incapacity, even though the defendant was deemed to have been competent to stand trial and to waive the right to counsel. If the court would have denied the defendant's request to represent himself at trial, the trial court shall grant the defendant a new trial in the criminal case; if not, the judgment in the criminal case is affirmed.[34] The judgment in the probation violation case is reversed and the case is remanded for a new probation violation hearing.

In this opinion the other justices concurred.

---

[34] This court retains jurisdiction for purposes of any appeal from the decision of the trial court either granting or denying the defendant a new trial in the criminal case.