******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* AUBURN W.*

(AC 42126)

Alvord, Elgo and Devlin, Js.

*Syllabus*

Convicted of the crimes of harassment in the second degree, stalking in the second degree and of having committed offenses while on release, the defendant appealed to this court, claiming that the trial court improperly determined that he forfeited his right to self-representation. The trial court had granted the defendant's motion to represent himself after it determined that he was competent to do so following a competency evaluation. After finding that the defendant was competent and able to assist in his defense, the court canvassed him as to his waiver of his right to counsel and informed him that a resumption of his prior disruptive courtroom conduct could result in a forfeiture of the right to represent himself. The defendant thereafter engaged in obstructionist behavior in further proceedings despite multiple warnings from the trial court. The court also noted that the defendant's extensive witness list included the names of two deities, and the prosecutor expressed concern about the defendant's competency to represent himself after stating that the discovery the defendant provided to him contained the defendant's original song lyrics and a short story and photographs of the defendant and his children. The court then ruled that the defendant had forfeited his right to self-representation. *Held* that the trial court reasonably concluded that the defendant would not be competent to discharge the essential functions necessary to conduct his defense without the assistance of counsel: the court did not abuse its discretion in finding that the defendant had a mental illness or mental incapacity that would interfere with his competency to conduct trial proceedings, which supported the court's conclusion that he forfeited his right to self-representation, as the psychiatrist who conducted the competency evaluation of the defendant diagnosed him with a personality disorder, the court determined after the competency hearing that the defendant exhibited signs of individual functioning problems that included disordered thinking and impaired expressive ability, and it was reasonable to infer that the defendant's habitual recalcitrant behavior was associated with the diagnosis of a personality disorder with borderline narcissistic and obsessive-compulsive traits, which reflected incompetence to represent himself and would have inhibited his ability to conduct proceedings before a jury; moreover, the court reasonably could have concluded that the defendant's difficulty in grasping legal issues pertaining to the proceedings, his misunderstanding of the distinct roles of the court and the prosecutor, and his difficulty communicating appropriately with the court permitted the inference that he would not be competent to conduct trial proceedings without counsel's assistance; furthermore, the defendant's behavior could not be dismissed as malingering, as he characterized his behavior to the evaluation team as wilful and, despite warnings from the court that he could forfeit the right to self-representation if he did not behave appropriately, he did not sufficiently correct his obstreperous behavior, which permitted the inference that he would be unable to do so as a result of mental illness or incapacity.

Argued March 5—officially released June 30, 2020

*Procedural History*

Substitute information charging the defendant, in the first case, with two counts of the crime of harassment in the second degree, and two part substitute information in the second case, charging the defendant, in the first part, with two counts of the crime of harassment in the second degree, and, in the second part, with having committed an offense while on release, and two

part substitute information in the third case, charging the defendant, in the first part, with two counts each of the crimes of harassment in the second degree and stalking in the second degree, and, in the second part, with having committed an offense while on release, brought to the Superior Court in the judicial district of Litchfield, geographical area number eighteen, where the court, *Dooley*, *J.*, granted the defendant's motion for self-representation; thereafter, the court, *Bentivegna*, *J.*, granted the state's motion to consolidate the cases for trial and entered an order that the defendant had forfeited his right to self-representation; subsequently, the first information and the first parts of the second and third informations were tried to the jury before *Bentivegna*, *J.*; verdicts of guilty; thereafter, the court, *Bentivegna*, *J.*, vacated the verdicts as to two counts of harassment in the second degree and one count of stalking in the second degree and dismissed the charges; subsequently, the second parts of the second and third informations were tried to the jury; verdicts of guilty; judgments of guilty of four counts of harassment in the second degree, one count of stalking in the second degree and sentences enhanced for having committed offenses while on release, from which the defendant appealed to this court. *Affirmed.*

*Daniel J. Krisch*, assigned counsel, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Dawn Gallo*, state's attorney, and *Gregory L. Borrelli*, assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Auburn W., appeals from the judgments of conviction, rendered following a jury trial, of three counts of harassment in the second degree in violation of General Statutes § 53a-183 (a) (2), one count of harassment in the second degree in violation of § 53a-183 (a) (3), and one count of stalking in the second degree in violation of General Statutes (Rev. to 2015) § 53a-181d (b) (1).[1] On appeal, the defendant claims that the trial court improperly held that he forfeited his right to self-representation on the basis of a lack of competence. We disagree and, thus, affirm the judgments of the trial court.

The following facts and procedural history are relevant to this appeal and are set forth in detail, a reflection of the defendant's presumptive constitutional right to represent himself. See *Faretta* v. *California*, 422 U.S. 806, 807, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). The charges against the defendant stem from his unsolicited telephone calls, text messages, and e-mail communications to the three victims, C, F, and Attorney W. The defendant was charged as a result of his conduct related to C, F, and W in May, 2015, January, 2016, and September, 2016, respectively.

There were extensive pretrial proceedings in these joined cases, the most relevant of which began on November 28, 2017, when the court, *Dooley, J.*, held a hearing on the defendant's motion to replace his assigned defense counsel, Attorneys Christopher Y. Duby and Robert L. O'Brien. The defendant alleged misconduct against Duby and O'Brien, stated that he would be filing a police report, was seeking their prosecution, and would file a grievance against them. The defendant further claimed that Duby and O'Brien breached ethical duties to him, were providing inadequate assistance of counsel, and had conflicts of interest, including that they did not "want to expose what's gone on in this . . . courthouse . . . because they will lose business."

Judge Dooley denied the defendant's motion to replace his assigned defense counsel. The defendant, both before and after Judge Dooley's ruling, declared three times that he would represent himself. Judge Dooley warned the defendant that a decision to represent himself was "an incredibly bad idea" and stated that "refusing counsel is . . . not an option. If you'd like to make a motion that you be permitted to represent yourself, I can undertake that motion . . . ." Undeterred by Judge Dooley's warning, the defendant orally moved to represent himself. In response to the defendant's motion, Judge Dooley ordered a five minute recess so that the defendant could "talk to [Duby and O'Brien] about the question of self-representation."

When the court reconvened, O'Brien reported that

he had advised the defendant of his constitutional right to an attorney and that, should he waive that right, he would be "expected to follow all the rules and procedures of the court." According to O'Brien, the defendant told him "that he didn't understand" but, nonetheless, O'Brien "believe[d] that [the defendant was] aware of what his obligations would be" if he represented himself. O'Brien further stated that there was no further conversation between them because of "the attitude" O'Brien received from the defendant. The defendant told Judge Dooley that he did not understand why O'Brien was asking him if he understood his constitutional right to an attorney. Judge Dooley responded that she thought that it was prudent for him to speak with his defense counsel before deciding whether to represent himself without the assistance of counsel. Judge Dooley again ordered a recess so that the defendant would have that opportunity. Prior to the second ordered recess, however, the defendant again raised a concern about whether Duby and O'Brien could adequately represent him, to which Judge Dooley told the defendant that the issue had "already been resolved by my ruling . . . ."

When the hearing resumed after the second recess, O'Brien reported to the court his impression that the defendant was "aware of what's going on," and was "aware of his obligations, the procedure into the court and . . . decorum." The defendant stated, "[t]hat's exactly what I said I'm not aware of," and then attempted once again to revisit the topic of whether O'Brien should continue to represent him. At this time, the prosecutor moved for a hearing, pursuant to General Statutes § 54-56d, to evaluate the defendant's competency under *Indiana* v. *Edwards*, 554 U.S. 164, 128 S. Ct. 2379, 171 L. Ed. 2d 345 (2008), and *State* v. *Connor*, 292 Conn. 483, 973 A.2d 627 (2009) (*Connor I*).

During a lengthy colloquy, Judge Dooley explained to the defendant what representing himself would entail and attempted to elicit a direct answer from him as to whether he was requesting to represent himself. The defendant provided equivocal answers to Judge Dooley's direct question, interrupted her and others numerous times, and raised immaterial issues. The defendant returned to his motion to substitute his assigned defense counsel, stated his intention to immediately appeal Judge Dooley's denial of that motion, and requested a change of venue because "[W] is well known by everyone in here." Judge Dooley warned the defendant multiple times to cease his interruptions or else she would remove him from the courtroom or "decide, based on the record developed here today, that you're not competent to represent yourself. . . . Because this is not a circus; this is not the Jerry Springer [television] show; this is not the big top. You're going to have jurors in here, and you will comport yourself with what we expect litigants and their lawyers and how they're to . . . behave. And what you're demon-

strating to me is that you're not capable of that, and under those circumstances I would not let you represent yourself." Eventually, the defendant did unequivocally request to represent himself.

The state reiterated its request that the defendant's competency to represent himself be evaluated. After noting her "significant concern . . . as to [the defendant's] ability to comport himself as required in a courtroom . . . [and] his ability to appropriately stay focused on the issues associated with jury selection and . . . the cross-examination or direct examination of witnesses," Judge Dooley ordered that the defendant's competency to represent himself be evaluated by the Department of Mental Health and Addiction Services (department). The defendant informed Judge Dooley what his "intent" was with respect to the evaluation: "I can make, I'm looney, I can go in there, make them think, sane. I can do whatever I wish." The defendant further stated, "I would like to apologize for my conduct; it has gone exactly as I hoped it would today."

Subsequently, Judge Dooley sua sponte raised the issue of the defendant's pretrial bond, indicating her intention to release the defendant from prison on a promise to appear that was accompanied by certain conditions. During the bond discussion, the defendant interjected frequently, informing Judge Dooley that he did "not want a reduction of bond." Judge Dooley warned the defendant five times to stop interrupting her and others before ordering him removed from the courtroom.

When the defendant eventually was permitted to return to the courtroom, he immediately stated his intention to file a grievance against the prosecutor and was told by Judge Dooley to stop interrupting. Soon thereafter, the defendant asked if he could withdraw his request to represent himself, to which Judge Dooley asked, "[d]o you realize that if you withdraw that request, then you can never reassert it?" The defendant then informed Judge Dooley that he did not know if he wanted to withdraw his request to represent himself. When Judge Dooley pressed for an unambiguous answer, the defendant instead sought to address prior comments made by the prosecutor. Judge Dooley redirected the discussion back to the issue of the defendant's pretrial bond without first getting a definitive answer from him as to the status of his request to represent himself.

Prior to and while Judge Dooley was issuing her ruling on his bond, the defendant interjected, "why are you trying to lower my bond? This doesn't make sense to me," "[w]atch this," "[h]ave you ever seen Star Trek, The Wrath of Khan?" and, "[h]ere it comes." When the prosecutor raised an issue concerning a protective order, the defendant again began interrupting the proceedings, including by stating that he would not recog-

nize the protective order's restriction against contacting his three children. The defendant was warned three times by Judge Dooley to stop talking and then was ordered removed from the courtroom for the second time during that hearing. Judge Dooley stated, "I think what we've seen here today is gamesmanship, manipulation, deceit on many, many levels and . . . at this juncture, the court is going to get its evaluation . . . ." Judge Dooley then asked Duby and O'Brien to collect contact information from the defendant during the court's luncheon recess for his competency evaluation.

After the court reconvened, the defendant was permitted to return to the courtroom. The prosecutor stated to the court that, in the holding cell, the defendant "refus[ed] to leave and shout[ed] various statements, basically to the effect that he was going to violate the protective orders as soon as he exited the court." The bail commissioner reported that her attempts to speak with the defendant and have him sign a written promise to appear were unsuccessful because "he kept asking questions and redirecting our conversation." In light of the defendant's conduct, the state moved, and Judge Dooley ordered, that the defendant's bond be increased on each of his files. As Judge Dooley was explaining the predicate for her ruling, the defendant interjected, stating, "[t]hat's awesome. That is the best thing she could have said on the record. That is the best thing she could have said."

The defendant next appeared in court on January 30, 2018, when Judge Dooley conducted a competency hearing. The defendant interrupted the proceedings almost immediately to move to change venue, which Judge Dooley stated she would not entertain because "we don't have hybrid representation in the state of Connecticut . . . ." Psychiatrist Ish Bhalla testified as to the January 29, 2018 competency evaluation that he produced regarding the defendant. Before Bhalla could begin his testimony, however, the defendant interrupted the proceedings multiple times, causing Judge Dooley to take a recess in order to switch courtrooms to one equipped with an observation room, into which the defendant was placed when the proceedings reconvened.

Bhalla resumed testifying in the new courtroom. The testimony was punctuated by the defendant's audible shouting from inside the observation room. Judge Dooley ordered the defendant removed from the observation room because he was so disruptive to the proceedings inside the courtroom.

After the defendant was removed from the observation room, Bhalla testified that he was unable to form an opinion as to whether the defendant understood the nature of the proceedings against him but that, in his opinion, the defendant was not able to assist in his defense. Bhalla further testified that there was a sub-

stantial probability that the defendant could be restored to competency within eighteen months and that the least restrictive means of doing so would be by inpatient hospitalization. On redirect examination, Bhalla also testified that some of what he observed in the defendant, such as tangential thinking, the failure to redirect, and suspiciousness, "would transfer over to [the assessment of the defendant's ability to represent himself]." In response to questioning from Judge Dooley, Bhalla agreed with her that the disruptive behavior exhibited by the defendant that day was "consistent with the symptomology that [he] saw presented during [his] evaluations."

After Bhalla's testimony, Judge Dooley found that the defendant was not presently competent to assist in his defense and that there was a "substantial probability that [he] may be restored to competency within the maximum period of placement, and . . . that the least restrictive setting in which to have that restoration of competency occur is . . . with the [department] at Whiting [Forensic Division of Connecticut Valley Hospital in Middletown]."

At the next hearing, on April 4, 2018, the March 28, 2018 competency evaluation produced by the department was entered into evidence as a court exhibit. The report concluded that the defendant was "fully competent and that he [understood] the nature of the charges against him and [is] able to assist in his defense." After neither party requested a hearing on the issues contained in the report, Judge Dooley asked the defendant if it was his "present desire to represent [himself] in [the] proceedings," to which the defendant responded in the affirmative. Judge Dooley then proceeded to canvass the defendant to determine whether he was competent to represent himself and whether he was knowingly, intelligently, and voluntarily waiving his right to the assistance of counsel. During the canvass, Judge Dooley told the defendant that she did not "have a question about [his] cognitive abilities," but she did share her "substantial concern[s]" regarding his conduct in past hearings that, if exhibited again, would "immediately come out to a forfeiture of that right." Judge Dooley ultimately concluded that the defendant knowingly, intelligently, and voluntarily waived his right to the assistance of counsel and was competent to represent himself. Thus, the defendant's request to represent himself was granted; Duby and O'Brien were appointed standby counsel.

The parties next appeared before the court, *Matasavage, J.*, in the morning of April 23, 2018, for a settlement discussion, which did not result in a plea deal. In the afternoon, the court, *Bentivegna, J.*, conducted a bond hearing. Judge Bentivegna denied a reduction in bond because of his "significant concerns, based on what [he] heard . . . as to whether or not [the defendant

would] be willing to comply with the protective orders."

The parties again appeared before Judge Matasavage for a pretrial settlement discussion on July 10, 2018. Despite the purpose of the day's hearing, the defendant began by discussing a motion he had filed, in which he asserted that "the defense has not been afforded pretrial conferences with effective counsel . . . ." Judge Matasavage responded that the defendant's "pretrial conference is right now" but that he was prepared to delay the day's conference until 2 p.m. in order to give the defendant additional preparation time. Before Judge Matasavage could order a recess, the defendant stated that "pretrial conferences are not just a one time meeting" and that pretrial conferences "can take weeks and weeks." The defendant explained that he would "engage with . . . a good faith attitude; however, [he would] not . . . accept a form of cursory justice in which [he felt] rushed to . . . make a decision, especially when [he had] only been counsel for three months . . . ." The defendant then informed Judge Matasavage that the state had not provided him with exculpatory evidence—transcripts from his nine day divorce trial. The prosecutor disputed the defendant's contention, explaining that he had turned over his "complete file" to the defendant. The prosecutor further asserted, and Judge Matasavage agreed, that the prosecutor had no duty to search for exculpatory evidence and that the defendant could order the transcripts from his divorce trial if he believed they contained exculpatory evidence.

At multiple times throughout the hearing, the defendant took the settlement discussion off course. At one point, he stated that "[the prosecutor] does not have probable cause." Later, the defendant contested the basis for the protective orders that were part of the state's plea offer. Judge Matasavage stated that if the defendant did not want to plead guilty and have protective orders imposed against him, he could proceed to trial. The defendant responded, "I'm speaking to the record for posterity and to preserve an issue and for an offer of proof because I've been dealing with this court now for five years and this court—no offense, is highly corrupt. I am getting a change of venue, there is no way that this trial will be tried in Torrington at all, especially considering the fact that . . . everybody here works with . . . [W], everybody."

When Judge Matasavage asked the defendant "how would [he] like to resolve the case today," the defendant responded that "[he had not] been constitutionally arraigned" and that, "[r]ight now, there are no pleas on the record" because of ineffective assistance of counsel. The defendant further informed the court that "there are more pleas than guilty, not guilty, nolo contendere." During the hearing, Judge Matasavage cautioned the defendant five times that he was being obstructionist and once that his right to represent himself was not

absolute. The hearing concluded without the defendant's accepting the state's offered plea deal and with Judge Matasavage telling the defendant that he had "been nothing but obstructive during this whole hearing."

On the following day, the parties appeared before Judge Bentivegna for a pretrial motion hearing. The first motion discussed was the defendant's motion to allow media access and coverage. Judge Bentivegna explained that the motion was not necessary because all criminal cases were presumed open to the public. Nonetheless, the defendant explained that he had "encountered, basically, a kangaroo court within the last six years" so that he believed that it was "imperative that the media be here as a watchdog, not on me, but on this court." After Judge Bentivegna reiterated that the trial would be open to the public and the media, the defendant further stated that "there's a lot of connivance going on from the part of the state, trying to stop the member of the press, so named natural person, [the defendant], from reporting as a freelance journalist on what he has seen and witnessed with his own eyes." Judge Bentivegna warned the defendant that, "in the past, there's been an issue with you interrupting the judge," which he would not tolerate.

Next, the defendant's motion concerning his treatment by the courthouse marshals was discussed. The defendant "want[ed] to be heard," even though he also intended to "file a state civil action . . . [and] a federal civil action against the marshal service . . . ." Judge Bentivegna stated, "that's not relevant to this case," and moved on to other issues.

The next motion discussed was the defendant's motion to withdraw his not guilty pleas because they were entered by ineffective counsel. Judge Bentivegna stated, "this is [an] issue that raises concerns about whether or not you're competent to represent yourself because . . . the fundamental issue here is that you're asking for a trial because you think that you're innocent. In order to have a trial, you have to enter not guilty pleas to the charges." The defendant responded that he wanted to return to the point prior to arraignment when he would have the opportunity to meet with the prosecutor and explain why the charges should be dismissed before he ever had to enter a plea. Judge Bentivegna stated, "this is not a motion to dismiss," and reiterated his concerns with the defendant's competency to represent himself. The defendant had hoped to enter an "obscure plea" that "basically stops everything short" but acceded to maintaining his not guilty pleas.

Subsequently, the defendant requested more pretrial conferences because the plea bargaining process "was riddled with bias and prejudice," and he had "the right to challenge the probable cause prior to trial." Judge Bentivegna explained that they were "past that" and

that the state had the burden at trial to prove the charges beyond a reasonable doubt, which is a higher standard than probable cause. The defendant "remind[ed] the court that the reason [they were] past that is because of ineffective counsel who never challenged the probable cause of the state." Although the prosecutor informed the court that four of the five cases had arrest warrants that could not be subject to a motion to dismiss, the defendant continued arguing that there was insufficient probable cause in his cases.

The defendant also accused the victims of perjury and "ask[ed] [the] court to charge them with perjury to the full extent of the law." For the third time at this hearing, Judge Bentivegna stated his concerns about the defendant's competency because the defendant did not understand that the court did not have the authority to charge anyone with a crime. In response, the defendant clarified that he understood that the prosecutor is the individual who charges crimes.

The defendant requested a copy of the oath taken by judges, attorneys, and Winsted police officers. He further requested that, as a matter of "good faith," standby counsel and the prosecutor print and provide to him the research materials cited in their motions because he did "not have a law library available to [him]." Judge Bentivegna denied the motion, stating that neither standby counsel nor the prosecutor had an obligation to provide the defendant with research materials. The defendant raised the prosecutor's failure to procure transcripts from the defendant's nine day divorce trial and provide them to him as a part of the prosecutor's duty to provide exculpatory evidence. Judge Bentivegna stated that the prosecutor had no obligation to get the transcripts. Before the court adjourned for the day, the defendant asserted that he intended to file a motion for a change of venue because of the "high prejudicial nature of this court against the defense" and "a myriad of due process violations" by the court and the prosecution.

On July 17, 2018, the parties again appeared before Judge Bentivegna for a hearing on pretrial motions. During the hearing, the state's motion for joinder was argued. The defendant disputed the merits of the charges against him and asserted that the prosecutor had misrepresented factual aspects of his cases, including his motive and intent. The defendant argued that the issues in each case were not related to one another, that the case involving C would take "possibly four to five days," then it would take eighteen days to try the cases involving C and F, and another twelve to fifteen trial days to try the case involving W. During his argument, the defendant was warned by Judge Bentivegna six times that he was "getting off track," sounded like he was testifying, was "getting far afield of what the arguments . . . are for this," and was "raising a lot of

factual issues that may or may not be relevant at the trial." Judge Bentivegna further told the defendant that, although he thought that the defendant had "some understanding of the law," he was concerned that the defendant lacked the competency necessary to represent himself and that the court was nearing a decision that the right had been forfeited.

Judge Bentivegna next went through the defendant's witness list. The defendant's witness list was comprised of forty-eight names, including "Yahuah Elohim," "Yehosua Masiah," the prosecutor, Attorney General George Jepsen, Winsted Mayor A. Candy Perez, Justice Andrew J. McDonald, and Chief State's Attorney Kevin T. Kane. Judge Bentivegna immediately stated his concerns about the defendant's competency to represent himself, given the fact that he requested to subpoena two deities. The defendant explained that, despite listing these two names on his witness list, he "wasn't asking to subpoena [them]. I trust in God, so he is going to be my witness at the case." Judge Bentivegna asked, "is [it] your position that God is going to be a witness here," to which the defendant questioned in response, "[a]re you putting my faith on trial with that question?" The defendant clarified that he figuratively listed the two deities and did not intend to have them testify.

Judge Bentivegna expressed concerns about the defendant's competency to represent himself on the basis of other witnesses he listed. With respect to witnesses who pertained to the defendant's prior divorce case, Judge Bentivegna stated, "I'm concerned that you don't have a fundamental understanding as to how the issues are different in a divorce case and a criminal case." When discussing the defendant's request to subpoena a social worker from the Department of Children and Families to support a justification defense, Judge Bentivegna stated that "she can't testify to your intent." Judge Bentivegna had similar concerns when the defendant sought to call a witness to testify to W's fear of the defendant, stating that someone else could not testify as to her thinking.

The defendant sought to call the psychologist who performed his March 28, 2018 competency evaluation to "testify that there is no intent" on his part because his alleged criminal conduct was a form of habit, routine or practice under § 4-6 of the Connecticut Code of Evidence, prompting Judge Bentivegna to again state his concerns with the defendant's competency to represent himself. Duby, acting as standby counsel, assisted the defendant by articulating the logic behind calling this witness. After hearing Duby's clarification, Judge Bentivegna deferred ruling on that witness. Judge Bentivegna further noted his concerns with the defendant's competency on the basis of the defendant's having indicated that he planned to testify in one of three cases, despite "raising issues that seem to require that [he] would

testify in all three cases . . . ." Judge Bentivegna stated, "I do not think that you understand how complicated this criminal trial is going to be."[2]

The parties appeared before Judge Bentivegna the following day. At the beginning of the hearing, the prosecutor expressed his concerns about the defendant's competency to represent himself after, inter alia, receiving the defendant's discovery materials, which included thirty-one pages of original song lyrics and an original short story, both written by the defendant, and thirty-nine photographs of the defendant and his three children. Accordingly, the prosecutor requested that Judge Bentivegna "revisit whether he remains competent to represent himself under Connecticut's heightened standard." The defendant argued in response that what he provided in discovery was relevant.

Judge Bentivegna issued a comprehensive oral ruling, concluding that the defendant forfeited his right to self-representation. Judge Bentivegna stated that the record from November 28, 2017, to April 4, 2018, revealed the following: The defendant was disruptive and obstructive during the November 28, 2017 and January 30, 2018 hearings before Judge Dooley, necessitating his removal from the courtroom on three occasions and once from the observation room; the January 29, 2018 competency evaluation concluded that the defendant was not competent but restorable, had self-reported post-traumatic stress disorder, but otherwise provided no records of his medical history, and that a longtime friend of the defendant reported that the defendant had anxiety and depression; Bhalla opined that "it would be very difficult for a person who presented with difficulty redirecting or tangential thought process to represent himself"; the March 28, 2018 competency evaluation concluded that the defendant was competent to represent himself but also diagnosed him with a personality disorder with borderline narcissistic and obsessive-compulsive traits; and, at the April 4, 2018 hearing, Judge Dooley found the defendant competent to represent himself and that he had improved his conduct since earlier hearings, and granted him the right to represent himself while also appointing standby counsel and warning the defendant that his right to self-representation could be forfeited.

Judge Bentivegna then summarized the record since April 4, 2018, which reflected the following: The defendant had filed approximately twenty-four motions and pleadings, "some of [which] rely on nonlegal references and arguments, some of [which] make nonsensical arguments and some of [which] are repetitive and redundant"; the defendant "was not able to grasp fully that pleading not guilty was a procedural necessity, in terms of having a trial"; the defendant sought preliminary hearings without "understanding that preliminary hearings are limited to the most serious crimes"; the defen-

dant "did not understand that because most of his cases were based on arrest warrants, he was not entitled to a probable cause hearing"; the defendant requested that the court should charge witnesses that he suspected would commit perjury, despite its inability to do so; and, the defendant exhibited confusion as to aspects of discovery, standby counsel, and criminal law and procedure.

Judge Bentivegna stated that, at the hearing held the previous day, some of the defendant's arguments on the motions for joinder and for severance "were totally off track," "[a]t times the defendant seemed to be testifying . . . [a]nd it sounded like he was planning to retry his divorce case in these criminal cases." Judge Bentivegna noted the defendant's witness list, particularly its inclusion of deities, that the defendant anticipated calling approximately thirty-three witnesses, and that he predicted that the trial would last several weeks. Judge Bentivegna stated that his "general impression is that the defendant does not clearly understand criminal procedure." Moreover, Judge Bentivegna raised additional concerns stemming from the defendant's thinking that the courtroom marshals could become witnesses against him in his cases and from the defendant's discovery disclosures to the prosecution.

With respect to the defendant's mental health, Judge Bentivegna noted that it varied and that he exhibited signs of "individual functioning problems," including "disorganized thinking, impaired expressive ability, the manner in which [he] had conducted himself, [his] grasp of issues pertinent to the proceedings, and [he] has also demonstrated tangential thought process, which was one of the concerns raised by . . . Bhalla." Although he noted that "the defendant has generally conducted himself appropriately" during the July 11 and 17, 2018 hearings, and that he "has demonstrated some understanding of criminal law and procedure and has shown that he is trying very hard to represent himself," Judge Bentivegna concluded that the defendant's "understanding and ability to represent himself is so limited that he is not able to represent himself adequately." In light of the foregoing, Judge Bentivegna ruled that the defendant forfeited his right to self-representation.[3]

Subsequently, the defendant was found guilty of all counts; however, the court vacated two counts of harassment and one count of stalking. See footnote 1 of this opinion. The defendant was then was found guilty by the jury on the part B informations that alleged that he had committed crimes against F and W while on release in connection with the charges related to C. The defendant received a total effective sentence of twenty-four months incarceration, with the imposition of full, no contact protective orders in favor of C, F, and W. This appeal followed.

We begin our discussion with the established princi-

ples of law and our standard of review. The sixth amendment to the United States constitution provides in relevant part that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." See also *Gideon* v. *Wainwright*, 372 U.S. 335, 342, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963) (holding that sixth amendment right to counsel is made applicable to states through due process clause of fourteenth amendment). In *Faretta* v. *California*, supra, 422 U.S. 807, the Supreme Court held that "a defendant in a state criminal trial has a constitutional right to proceed *without* counsel when he voluntarily and intelligently elects to do so." (Emphasis in original.) "The [c]ourt implied that right from: (1) a nearly universal conviction, made manifest in state law, that forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so . . . (2) [s]ixth [a]mendment language granting rights to the accused; (3) [s]ixth [a]mendment structure indicating that the rights it sets forth, related to the fair administration of American justice, are persona[l] to the accused . . . (4) the absence of historical examples of *forced* representation . . . and (5) and respect for the individual . . . ." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Indiana* v. *Edwards*, supra, 554 U.S. 170. The right to self-representation, however, is not absolute, as articulated by the Supreme Court in *Faretta* and its progeny. See id., 171 (collecting cases).

In *Edwards*, the Supreme Court considered whether mental illness was a basis for limiting the scope of the self-representation right when a state court finds a criminal defendant competent to stand trial if represented by counsel but not mentally competent to conduct that trial himself. Id., 167, 171. More specifically, the court decided "whether in these circumstances the [federal] constitution prohibits a [s]tate from insisting that the defendant proceed to trial with counsel, the [s]tate thereby denying the defendant the right to represent himself." Id., 167. The court held that the federal constitution "permits [s]tates to insist upon representation by counsel for those competent enough to stand trial under *Dusky* [v. *United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960)] but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Indiana* v. *Edwards*, supra, 554 U.S. 178.

The court in *Edwards* provided three reasons to support its holding that the states could insist on representation by counsel for defendants who were not competent to conduct trial proceedings by themselves. First, the court determined that its precedent favored its holding. The court noted that its prior " 'mental competency' " cases, *Dusky* v. *United States*, supra, 362 U.S. 402, and *Drope* v. *Missouri*, 420 U.S. 162, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975), produced a standard measuring

competency that assumed the presence of counsel. *Indiana* v. *Edwards*, supra, 544 U.S. 170–71; see *Dusky* v. *United States*, supra, 402 (prong one of test asks "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding"). Because *Edwards* involved a defendant who was seeking to forgo the assistance of counsel, the court believed that the *Dusky* standard inadequately measured competency under the circumstances. *Indiana* v. *Edwards*, supra, 174–75. Furthermore, the court observed that *Faretta*'s holding was supported in part by preexisting state case law set forth in cases, "all of which are consistent with, and at least two of which expressly adopt, a competency limitation on the self-representation right." Id., 175.

Second, the court stated that the complexity of mental illness, which "varies in degree," "can vary over time," and "interferes with an individual's functioning at different times in different ways," militates against a unitary competency standard. Id., 175–76. Third, the court believed that a higher competency standard for self-representation at trial would best " 'affirm the dignity' of a defendant who lacks the mental capacity to conduct his defense without the assistance of counsel"; id., 176; ensure a fair trial, and demonstrate fairness to observers. Id., 177.

Although the court held that the federal constitution permitted "[s]tates to insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves"; id., 178; it declined to adopt a federal standard by which competency to represent oneself at trial would be assessed.[4] Id.

Following the Supreme Court's decision in *Edwards*, our Supreme Court decided *Connor I*, supra, 292 Conn. 483, in which the defendant, despite a history of mental health issues, was found competent to represent himself and his request to do so was granted. Id., 502–503. In *Connor I*, the defendant had recently suffered a stroke that rendered him unable to walk. Id., 490. The defendant's competency to stand trial was evaluated three times but was hindered each time by the defendant's failure to cooperate with the evaluation teams. Id., 491, 492, 494, 495, 497–98. The first evaluation team concluded "that [the defendant] most likely would not be competent to stand trial." Id., 494. The court accepted this conclusion, found that the defendant was not competent to stand trial and ordered that he be committed to Connecticut Valley Hospital for the purpose of restoring his competency. Id. The second and third competency evaluation teams, however, concluded that the defendant was malingering and, thus, was competent to stand trial. Id., 495, 498, 520. Relatedly, two trial court judges observed that the defen-

dant's in-court conduct was consistent with malingering. Id., 499–501.

After the defendant was found competent to stand trial following his third competency evaluation, he requested that he be allowed to represent himself at trial. Id., 501. The court cautioned the defendant against doing so but canvassed him, found him competent to represent himself, and granted the request. Id., 502–503. After a jury found him guilty of various charges; id., 504; the defendant appealed to our Supreme Court, claiming, inter alia, that the trial court deprived him of his right to the assistance of counsel, in violation of the federal and state constitutions, by improperly concluding that he was competent to waive his right to counsel at the trial of his criminal case. Id., 505–506.

Our Supreme Court in *Connor I* rejected the defendant's constitutional claims, concluding that "the trial court reasonably found that the defendant was competent to stand trial and, therefore, that he also was competent, for constitutional purposes, to waive his right to counsel." Id., 519–20. The court "conclude[d], however, in the exercise of [its] supervisory authority over the administration of justice, that a defendant, although competent to stand trial, may not be competent to represent himself at that trial due to mental illness or mental incapacity." Id., 506. Therefore, "upon a finding that a mentally ill or mentally incapacitated defendant is competent to stand trial and to waive his right to counsel at that trial . . . trial court[s] must make another determination, that is, whether the defendant also is competent to conduct the trial proceedings without counsel." Id., 518–19. The court's decision to exercise its supervisory authority to require a distinct determination of a defendant's competency to conduct trial proceedings without the assistance of counsel was a reflection that "*Edwards* did not alter the principle that the federal constitution is not violated when a trial court permits a mentally ill defendant to represent himself at trial, even if he lacks the mental capacity to conduct the trial proceedings himself, if he is competent to stand trial and his waiver of counsel is voluntary, knowing and intelligent." Id., 517; see also id., 528 n.28 ("[b]ecause our conclusion is not constitutionally mandated, we adopt this rule in the exercise of our supervisory authority over the administration of justice"). In accordance with its holding, the court remanded the case "for a hearing on the issue of whether the defendant's mental illness or incapacity rendered him incompetent to represent himself at trial in the criminal case." Id., 506.

The court in *Connor I* did not "believe that it [was] prudent . . . to attempt to articulate a precise standard" to guide the trial court's analysis on remand but advised that "the trial court should consider all pertinent factors in determining whether the defendant has

sufficient mental capacity to discharge the essential functions necessary to conduct his own defense . . . ." Id., 530 n.32; see also *Indiana* v. *Edwards*, supra, 554 U.S. 175–76 (stating that "basic tasks needed to present [a] defense without the help of counsel" are "organization of defense, making motions, arguing points of law, participating in voir dire, questioning witnesses, and addressing the court and jury"). Factors for consideration include "the manner in which the defendant conducted the trial proceedings and whether he grasped the issues pertinent to those proceedings, along with his ability to communicate coherently with the court and the jury." *Connor I*, supra, 292 Conn. 530; id., 530 n.32. With respect to the particular defendant in *Connor I*, the trial court was instructed to consider "any and all relevant information, including, but not limited to, the extent to which the defendant's competence to represent himself may have been affected by mental illness, by the stroke that he had suffered . . . any memory problems that he may have experienced as a result of that stroke," and "the extent to which [he] may have been feigning mental problems." Id., 529. The court underscored that this analysis was not to focus on "whether the defendant lacked the technical legal skill or knowledge to conduct the trial proceedings effectively without counsel" because that "has no bearing on whether he was competent to represent himself for purposes of *Edwards*." Id., 529–30.

We review a trial court's denial of a defendant's right to self-representation for an abuse of discretion. *State* v. *Braswell*, 318 Conn. 815, 830, 123 A.3d 835 (2015); *State* v. *Connor*, 170 Conn. App. 615, 621, 155 A.3d 289 (*Connor III*), cert. granted, 325 Conn. 920, 163 A.3d 619 (2017) (appeal withdrawn January 5, 2018);[5] see also *Indiana* v. *Edwards*, supra, 554 U.S. 177 ("the trial judge . . . will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant"); *Connor I*, supra, 292 Conn. 529 (same). "In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling . . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done. . . . In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors. . . . Our review of a trial court's exercise of the legal discretion vested in it is limited to the questions of whether the trial court correctly applied the law and could reasonably have reached the conclusion that it did." (Citations omitted; internal quotation marks omitted.) *Connor III*, supra, 621.

We now direct our attention to the present appeal. The defendant claims that the trial court "improperly

denied [him] the right to represent himself based on his supposed incompetence" because "[t]he record demonstrates that [he] is sane and can organize his claims, file motions, and argue points of law." More specifically, the defendant argues that he "is (and was) *not* mentally ill" and that the record reveals his capability to perform the basic tasks necessary for self-representation. (Emphasis in original.) We disagree.

In the March 28, 2018 competency evaluation, in which the defendant was found competent to stand trial after time spent at Connecticut Valley Hospital for the purpose of restoration, he was diagnosed with a personality disorder with borderline, narcissistic and obsessive-compulsive traits. The report also stated that the defendant had indicated suffering from post-traumatic stress disorder and that a prior New Haven Office of Forensic Evaluations report referenced his hospitalization two years prior for anxiety and depression. Because the defendant provided little information about his medical history and refused to sign releases for that information, the report stated that it could not be determined whether the defendant possessed these disorders but did note that he displayed no symptoms of them during his period of restoration. The report further found that the defendant presented no delusional thought processes or psychiatric symptoms requiring medication. The report also stated that the defendant "admitted freely (and even boasted) that his behavior was [wilful], intentional, and part of a calculated maneuver toward some goal," but the evaluators did not opine whether they agreed that the defendant was malingering.

On the basis of the foregoing, we conclude that Judge Bentivegna reasonably found that the defendant had a "mental illness or mental incapacity." *Connor I*, supra, 292 Conn. 506. Although parts of the March 28, 2018 evaluation concluded that the defendant did not present diminished mentation, it did diagnose him with a personality disorder. Moreover, in the January 29, 2018 competency evaluation, the defendant was found to have exhibited "no insight, [and] a disorganized, tangential, and loosely associated thought process." Judge Bentivegna, who, as the trial judge, had the most advantageous position to observe the defendant, concluded that, although the defendant's mental health varied, he exhibited signs of "individual functioning problems," including, "disorganized thinking, impaired expressive ability, the manner in which [he] had conducted himself, [his] grasp of issues pertinent to the proceedings, and [he] has also demonstrated tangential thought process, which was one of the concerns raised by . . . Bhalla." After a review of the January 29 and March 28, 2018 evaluations and the record from November 28, 2017 through July 18, 2018, we cannot conclude that Judge Bentivegna abused his discretion in reaching that determination. See *Indiana* v. *Edwards*, supra, 554 U.S. 175

(stating that mental illness "varies in degree," "can vary over time," and "interferes with an individual's functioning at different times in different ways"); *Connor I*, supra, 292 Conn. 529 (stating that trial court "is best able to make [a] fine-tuned mental capacity [decision], tailored to the individualized circumstances of a particular defendant" (internal quotation marks omitted)).[6]

We further conclude that Judge Bentivegna reasonably found that the defendant's mental illness or mental incapacity would interfere with his competency to conduct trial proceedings by himself and, thus, supported a conclusion that he forfeited his right to self-representation.

First, the manner in which the defendant conducted judicial proceedings raised concerns about his competency. While arguing points of law, the defendant frequently deviated from the issues then being discussed. For instance, on November 28, 2017, when Judge Dooley was attempting to determine whether the defendant was making a request to represent himself, the defendant resisted providing a direct answer, revisited her denial of his motion to substitute counsel, and stated his intention to file a motion to change venues.[7] During the July 10, 2018 settlement discussion before Judge Matasavage, the defendant claimed that the prosecutor was withholding exculpatory evidence from him, claimed that there was insufficient probable cause to bring the charges he faced, and contested the constitutionality of his arraignment.[8] Even during what was conceivably the defendant's display of his ability to represent himself, his argument against the state's motion for joinder, Judge Bentivegna told the defendant multiple times that he was "getting off track." These instances reasonably permitted an inference that, at times, the defendant presented disorganized and tangential thinking, which Bhalla testified to observing during the January 29, 2018 evaluation and in court on January 30, 2018, and which had the potential to reemerge. See *Indiana* v. *Edwards*, supra, 554 U.S. 175–76. Therefore, Judge Bentivegna reasonably concluded that the defendant's difficulty arguing points of law reflected an inability to conduct trial proceedings and, thus, an incompetence to represent himself in his upcoming criminal trial.

In addition, the defendant consistently interrupted proceedings before Judges Dooley, Matasavage, and Bentivegna, which further raised concerns regarding his ability to conduct trial proceedings. Our review of the record reveals that during each of the hearings between November 28, 2017, and July 17, 2018, the defendant was advised approximately sixty-six times to either stop interrupting and talking over others or that he was being obstructionist. The defendant accused the prosecutor of misconduct, of "being grossly inept at his job," and of malicious prosecution. The

defendant also stated he had encountered a "kangaroo court," that the court was "highly corrupt," and that his settlement discussions were "riddled with bias and prejudice." Thus, it was reasonable for Judge Bentivegna to infer that the defendant's habitual recalcitrant behavior was associated with his diagnosis of a personality disorder with borderline, narcissistic and obsessive-compulsive traits, and would have inhibited his ability to conduct future trial proceedings, particularly before a jury.

Second, the defendant displayed difficulty grasping issues pertinent to the proceedings. In particular, when making motions and arguing points of law, the defendant evinced a misunderstanding of legal concepts, the distinct roles of the court and the prosecutor, and the relevance to the criminal case of issues and potential witnesses and exhibits.

The defendant did not understand that the prosecutor's obligation under *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), does not extend to proactive acquisition of evidence that the defendant asserted was exculpatory. Further, the defendant did not understand that, in order to proceed to trial and prove his innocence, which he emphasized was critically important to him, he must plead not guilty. Despite repeated explanations to this effect from Judges Matasavage and Bentivegna, the defendant maintained a desire before both judges to change his guilty pleas to something "obscure . . . ." The defendant also pressed for a ruling that his trial be open to the public even after Judge Bentivegna informed him that such a ruling was not necessary because criminal trials are presumptively open to the public.

The defendant demonstrated a misunderstanding of the distinct roles of the court and the prosecutor. The defendant asked that the court charge the victims with perjury; only after Judge Bentivegna explained that that was not his role did the defendant express an understanding that charging decisions are made by the prosecutor. The defendant also believed that, notwithstanding the adversarial nature of our justice system, the prosecutor should, as a matter of "good faith," print and provide him with copies of research materials cited in the state's motions.

The defendant also raised irrelevant issues and requested that immaterial witnesses testify. Most prominently, he often sought to relitigate issues from his divorce trial, which were peripheral to the criminal charges against him. This not only presented concerns regarding the defendant's ability to grasp the relevant issues but, as a result, generated concerns about his ability to organize a defense. He further insisted that he "be heard" concerning alleged mistreatment by the courthouse marshals at a hearing before Judge Bentivegna, despite its immateriality to his criminal cases

and his stated intention to assert those claims in a civil action. The defendant also provided a witness list naming forty-eight "people," including two deities, a justice of our Supreme Court, the state's attorney general and chief state's attorney, and the Winsted mayor. He predicted that his criminal trial would take more than thirty days. Finally, the defendant claimed original song lyrics and a short story that he wrote, as well as photographs of him and his three children, were relevant discovery materials.

Judge Bentivegna reasonably concluded that the defendant's inability to grasp the foregoing issues had little to do with his ignorance of the law or a lack of technical expertise. The defendant maintained an insistence that the prosecutor must obtain transcripts from his divorce trial because they were exculpatory, that he change his guilty pleas, that his trial be open to the public, and that his divorce trial was relevant to his criminal charges, even after being told by the judges that his positions lacked legal foundation. Therefore, Judge Bentivegna reasonably could have concluded that the defendant's behavior was not a reflection of his ignorance of the law but of his personality disorder and occasionally diminished thought processes.

Third, at times, the defendant had difficulty communicating with the court. Although there were no concerns with the coherency of the defendant's communications, he displayed an inability to refrain from interrupting others, was disruptive, and frequently offered long, unfocused responses to questions and issues raised by the court. As stated previously, the defendant was told numerous times to stop interrupting or being disruptive between November 28, 2017, and July 17, 2018. The defendant was also removed from the courtroom three times and once from an observation room. Despite prior warnings to stop interrupting and being disruptive, as well as his removals from the courtroom and the observation room, the defendant did not comport his behavior in a fully appropriately manner before Judge Bentivegna, who also had to tell him to stop speaking a number of times. Although the defendant did improve his behavior after being restored to competency and granted the right to represent himself, he did not do so sufficiently to eliminate all concerns.[9] Accordingly, Judge Bentivegna reasonably could have inferred that the defendant would not be competent to conduct future trial proceedings without the assistance of counsel as a result of his difficulty communicating with the court. Additionally, given that the defendant faced charges of harassment and stalking as a result of many unsolicited telephone calls, text messages, and e-mail communications sent to the victims, Judge Bentivegna had reason to be concerned that the defendant's difficulty communicating appropriately with the court could compromise the fairness of his trial before a jury.

Fourth, the defendant's conduct cannot be dismissed as malingering. The defendant characterized his behavior as wilful to the evaluation team that performed his March 28, 2018 competency evaluation, but the team itself never opined as to whether the defendant's conduct was, indeed, volitional. At the November 28, 2017 hearing, Judge Dooley indicated that it was her belief that the defendant was engaging in "gamesmanship, manipulation, [and] deceit," but there was also support for the conclusion that the defendant could not regulate his behavior. For instance, the defendant was advised that his right to self-representation was not absolute and could be forfeited if he did not behave appropriately. Despite those warnings, the defendant, who earnestly sought to represent himself, did not sufficiently correct his obstreperous behavior, permitting the inference that he would be unable to do so as a result of mental illness or mental incapacity.

On the basis of the foregoing, Judge Bentivegna, as the trial judge well positioned to evaluate the circumstances of the defendant, reasonably concluded that the defendant would not be competent to discharge the essential functions necessary to conduct his own defense at his upcoming criminal trial without the assistance of counsel. See *Connor I*, supra, 292 Conn. 530 n.32.

The judgments are affirmed.

In this opinion the other judges concurred.

* In accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018); we decline to identify any person protected or sought to be protected under a protective order or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

[1] The defendant was charged in three informations that were joined for trial. In each of the three informations the defendant was charged with two counts of harassment in the second degree, one count in violation of § 53a-183 (a) (2) and one count in violation of § 53a-183 (a) (3). In one of those informations, the defendant was further charged with two counts of stalking, one count in violation of General Statutes (Rev. to 2015) § 53a-181d (b) (1) and one count in violation of General Statutes (Rev. to 2015) § 53a-181d (b) (2).

The jury returned guilty verdicts against the defendant on all counts. Thereafter, the court granted the state's motion to vacate the convictions of two counts of harassment and one count of stalking because, according to the parties, those counts were charged as alternative forms of liability against the defendant. Subsequently, the defendant was found guilty by the jury on a part B information in two cases of having committed offenses while on release.

[2] Before the hearing concluded, Judge Bentivegna granted the defendant permission to sit in the courtroom for the remainder of that day and in the morning of the next day to listen to and view media on a laptop because he was not permitted to possess it in prison. The defendant asked whether the marshals overseeing him in the courtroom while he viewed the media could be called as witnesses against him at trial, prompting Judge Bentivegna to state that this was another instance that gave him concerns about the defendant's competency.

[3] At his next court appearance, on July 24, 2018, the defendant filed a motion to reconsider the ruling denying him the right to represent himself, which the court denied.

[4] The court declined Indiana's request that it adopt a standard "that would deny a criminal defendant the right to represent himself at trial where the defendant cannot communicate coherently with the court or a jury." (Internal

quotation marks omitted.) *Indiana* v. *Edwards*, supra, 554 U.S. 178. The court also declined Indiana's request to overrule *Faretta*. Id.

[5] In *State* v. *Connor*, 321 Conn. 350, 138 A.3d 265 (2016) (*Connor II*), our Supreme Court reversed the judgment of this court, which had reversed the judgment of the trial court and ordered a new trial, because this court raised, sua sponte, the procedural inadequacy of the remand hearing, an issue that had not been raised or argued by the parties. Our Supreme Court remanded the case to this court to consider the defendant's claim that "the trial court abused its discretion when it erroneously concluded that the [defendant] was competent to represent himself at [his criminal] trial despite his mental illness or mental incapacity." (Internal quotation marks omitted.) Id., 360; see id., 375. On remand, the parties argued that the abuse of discretion standard applied, with which this court agreed before ultimately concluding that the trial court had not abused its discretion in determining that the defendant was competent to represent himself at his criminal trial. *Connor III*, supra, 170 Conn. App. 627. Subsequently, our Supreme Court granted certification to appeal from this court's judgment in *Connor III*. *State* v. *Connor*, 325 Conn. 920, 163 A.3d 619 (2017) (appeal withdrawn January 5, 2018).

[6] The defendant argues that criminal defendants may not be denied the right to self-representation unless they possess a "severe mental illness." In *Connor I*, our Supreme Court held that trial courts must assess whether "*mentally ill or mentally incapacitated*" defendants who request to represent themselves are competent to do so. (Emphasis added.) *Connor I*, supra, 292 Conn. 487. The court in *Connor I* did not once preface mental illness or mental incapacity with the adjective "severe." Accordingly, we disagree with the defendant's argument.

[7] We appreciate that, at this time, the defendant was not representing himself but, rather, was advocating that he be permitted to do so. Because, during this discussion, the defendant was engaged in a colloquy with Judge Dooley concerning his request to represent himself, we consider how the trial court's assessment of his behavior during the discussion reflected on his ability to conduct future trial proceedings.

Before this court, the defendant argued that only conduct following April 4, 2018, when he was found competent to represent himself, may be considered when reviewing Judge Bentivegna's ruling. We disagree. Judge Bentivegna in part relied on the defendant's "disruptive and obstructive conduct" that occurred before November 4, 2018. We find no issue with Judge Bentivegna's approach in this situation. Although the defendant was found competent to stand trial in the March 28, 2018 evaluation and found competent to represent himself on April 4, 2018, he was previously found incompetent to stand trial in the January 29, 2018 evaluation and, thus, his conduct prior to and following that evaluation reflects a pattern of mental incompetency that Judge Bentivegna could compare to his observations of the defendant when determining whether he would be competent to conduct future trial proceedings without the assistance of counsel. See *Indiana* v. *Edwards*, supra, 554 U.S. 175 (mental illness "varies in degree . . . [and] over time").

[8] In his oral ruling, Judge Bentivegna did not reference the settlement discussions that occurred before Judge Matasavage. There was adequate support for Judge Bentivegna's ruling even without considering the defendant's conduct before Judge Matasavage. Because, however, those discussions further demonstrate the defendant's difficulty conducting proceedings, grasping issues, and communicating with the court, we discuss them in our analysis.

[9] In his ruling, Judge Bentivegna stated that the defendant "generally conducted himself appropriately" during the July 11 and 17, 2018 hearings. This statement is not inconsistent with a conclusion that the defendant was, at times, disruptive during those hearings in a manner that was reminiscent of his prior conduct. Judge Bentivegna further stated that, in his view, the "right to self-representation at trial will not affirm the dignity . . . of a defendant who lacks the mental capacity to conduct his defense without the assistance of counsel. To the contrary, given [the] defendant's uncertain mental state, *the spectacle that could well result from his self-representation at trial* is at least as likely to prove humiliating as ennobling." (Emphasis added.) In light of this statement, and Judge Bentivegna's review of the defendant's "disruptive and obstructive conduct" before Judge Dooley, it appears that Judge Bentivegna did consider the defendant's behavior in reaching his decision that the defendant would not be competent to represent himself at trial. We concluded previously in this opinion that it was not improper for Judge Bentivegna to consider the defendant's prior conduct

in making his ultimate decision that the defendant would be incompetent to conduct future trial proceedings without the assistance of counsel. See footnote 7 of this opinion.

————————————————